ROM BAR-NISSIM (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

JARRETT LEE ELLZEY (*pro hac vice application forthcoming*)
JEllzey@EKSM.com
TOM KHERKHER (*pro hac vice application forthcoming*)
TKherkher@EKSM.com
LEIGH S. MONTGOMERY (*pro hac vice application forthcoming*)
LMontgomery@EKSM.com
NATISCHA VOLPE (*pro hac vice application forthcoming*)
NVolpe@EKSM.com
**ELLZEY KHERKHER SANFORD MONTGOMERY LLP**
4200 Montrose Street, Suite 200
Houston, TX 77006

Attorneys for Plaintiffs
TED ENTERTAINMENT, INC.
MATT FISHER
GOLFHOLICS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, and GOLFHOLICS, INC., each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant | Case No.: 3:25-cv-10931<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Ted Entertainment, Inc. ("TEI"), Matt Fisher, and Golfholics, Inc. (collectively, where appropriate "Plaintiffs"), each individually and on behalf of all others similarly situated, by and through their undersigned counsel, file this Complaint against Meta Platforms, Inc. ("Defendant"), and alleges as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This lawsuit arises from Defendant unlawfully circumventing technological measures to access and scrape millions of copyrighted videos from the online video viewing platform, YouTube, in order to feed, train, improve, and commercialize Defendant's large-scale generative artificial intelligence ("AI") model, "Make-A-Video."

2.      Make-A-Video is an artificial intelligence system designed by Defendant to generate video output from text input. This "text to video" system is intended to allow consumers to generate videos using text prompts.

3.      Instead of a standalone app named "Make-A-Video," the technology is now a core feature within the Meta AI assistant experience. Users can leverage this capability through features like "Vibes" (a feed for AI videos) or by clicking "Animate" to turn a static image into a video within Facebook, Instagram, or the meta.ai website.

4.      The research from Make-A-Video has paved the way for more advanced tools, such as the "Movie Gen" model, a more powerful text-to-video generator capable of creating longer, high-definition videos, which is being tested for future release on platforms like Instagram.

5.      YouTube allows the public to view audiovisual works only through controlled streaming and never provides access to the underlying video files. Defendant intentionally bypassed those restrictions by deploying scraping tools designed to evade YouTube's access protections. Defendant used a video-downloading program combined with virtual machines that rotated IP addresses to avoid detection and blocking. Defendant used Plaintiffs' and Class Members' intellectual property for its own commercial gain. In doing so, Defendant has violated YouTube's Terms of Service, which were intended to protect Plaintiffs and others similarly situated.

6.      By scraping and downloading those files in order to build Make-A-Video, Defendant deliberately circumvented YouTube's access controls.

7. Plaintiffs and the Class Members whom Plaintiffs seeks to represent are content creators who upload their audiovisual content to YouTube. In doing so, the content creators are authorizing and instructing YouTube to provide protection to the video content through YouTube's anti-circumvention software and Terms of Service. In fact, YouTube's anti-circumvention software and protective Terms of Service are a driving factor behind content creators' decision to upload their video content to YouTube.

8. Rather than seek permission or pay a fair price for the audiovisual content hosted on YouTube, Defendant harvested content creators' protected and copyrighted videos at scale without consent or compensation.

9. Defendant's actions were not only unlawful, but an unconscionable attack on the community of content creators whose content is used to fuel the multi-trillion-dollar generative AI industry without any compensation.

10. Content creators such as Plaintiffs and the Class Members will never be able to claw back the intellectual property unlawfully copied and used by Defendant to train its generative AI. Once AI ingests content, that content is stored in its neural network, and not capable of deletion or retraction. Defendant's actions constitute abuse and exploitation of content creators' work for Defendant's profit.

11. Most YouTube videos are not registered with the U.S. Copyright Office. That lack of registration, however, does not render them valueless or leave them unprotected. Content creators invest time, skill, and resources into producing their works, and they rely on YouTube's technological protection measures to safeguard their files from unauthorized access. Because copyright registration is not a prerequisite for protection against unlawful circumvention of access controls, this claim is especially critical where Defendant's misconduct lies in breaking through access barriers that prevent anyone from obtaining the underlying files in the first place

12. Plaintiff Ted Entertainment, Inc. is an independent content creator with over 5,800 original videos on YouTube, with a combined total of over 4,000,000,000 YouTube views. Plaintiff has additionally amassed a substantial following on YouTube of over 2,600,000 subscribers. Plaintiff has invested substantial time and money into bringing awareness around his content.

CLASS ACTION COMPLAINT

13.     Plaintiff Matt Fisher is an individual and resident of the State of California.  He is a golf content creator who posts videos on YouTube, many of which are instructional.  His channel is @Mr.ShortGame on the YouTube platform.  He has over 500,000 subscribers and hundreds of millions of views.  Plaintiff has invested substantial time and money into bringing awareness around his content.

14.     Plaintiff Golfholics is a corporate entity organized pursuant to the laws of the State of California.  It is a golf content channel who posted videos on YouTube.  The channel is @Golfholics on the YouTube platform.  It has over 130,000 subscribers and millions of views. Plaintiff invested substantial time and money into bringing awareness around its content.

15.     Like Plaintiffs, the Class Members in this case are independent content creators who uploaded their video content to YouTube's video platform. The video content of Class Members was also part of the dataset utilized by Defendant to train its AI model.

16.     An essential component of Defendant's business model—powering AI features and services with large-scale training data—includes the mass acquisition and ingestion of creators' videos scraped from YouTube.

17.     Defendant has profited and will continue to profit substantially from its infringement of Plaintiff's and Class Members' video content through Defendant's training of its generative AI products. Defendant's financial and technological success would not have been possible without the video content created by Plaintiffs and Class Members, which was intended for streaming on YouTube.

18.     Plaintiffs brings this class action on behalf of themselves and of a nationwide class of YouTube creators whose works were scraped, ingested, and trained on without authorization, seeking statutory damages, injunctive relief, restitution, and all other remedies allowed by law pursuant to the Digital Millennium Copyright Act, 17 U.S.C.A. § 1201(a), seeking an injunction and damages commensurate with the scope of Defendant's massive and ongoing infringement. More particularly, Defendant's conduct violates the provisions of the DMCA regarding anti-circumvention (§1201) by bypassing technological protection measures that control access to and copying of YouTube videos.

**THE PARTIES**

19.     Plaintiff TEI is a California based media company that owns and operates the YouTube channels "h3h3 Productions" and "H3 Podcast Highlights." Both channels appear extensively in the dataset Defendant used to train its artificial intelligence model. H3H3 Productions has 146 videos in HD-VILA-100M. H3 Podcast Highlights has 285 videos in HD-VILA-100M. TEI invested significant resources into producing and publishing this video content, and every one of these videos was downloaded, copied, and ingested by Defendant without authorization.

20.     TEI is the creator of the videos identified in Exhibit A, all of which were uploaded exclusively to YouTube by TEI and all of which were included in the dataset used by Defendant to train its generative AI models. TEI derives value from the works identified in Exhibit A through viewership, advertising, sponsorships, licensing, and related monetization.

21.     TEI and its owners – Ethan and Hila Klein – are longtime champions of the rights of YouTube creators. The Kleins helped define what constitutes fair use reaction videos and the good faith belief standard for DMCA counternotifications. TEI has championed online free speech and is currently helping define what reaction content does not constitute fair use to ensure YouTube content creators can enjoy the fruits of their labor.

22.     Plaintiff Matt Fisher is an individual and resident of the State of California.  He is a golf content creator who posts videos on YouTube, many of which are instructional.  His channel is "Mr.ShortGame Golf" on the YouTube platform.  He has over 500,000 subscribers and hundreds of millions of views.  Fisher has invested substantial time and money into bringing awareness around his content. Mr.ShortGame Golf has 2 videos in the HD-VILA-100M dataset.

23.     Plaintiff Golfholics is a corporate entity organized pursuant to the laws of the State of California.  It is a golf content channel who posted videos on YouTube.  The channel is "Golfholics" on the YouTube platform.  It has over 130,000 subscribers and millions of views. Golfholics invested substantial time and money into bringing awareness around its content. Golfholics has 62 videos in the HD-VILA-100M data set.

24.     Defendant Meta Platforms, Inc., is a Delaware corporation with its principal place

of business at 1 Meta Way, Menlo Park, CA 94025.

**JURISDICTION AND VENUE**

25.     This is a civil action seeking damages and injunctive relief for infringement under the Digital Millennium Copyright Act, 17 U.S.C. §§ 1201–1205. As such, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), based on federal question jurisdiction.

26.     The Court has supplemental jurisdiction over related state-law claims, if any, under 28 U.S.C. § 1367.

27.     Personal jurisdiction is proper because Defendant's principal place of business is in Menlo Park, California, and because Defendant transacts business nationwide, purposefully avails itself of this forum, and a substantial part of the events or omissions giving rise to these claims occurred or were directed here.

28.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and/or 1400(a) because Defendant resides in, is found in, or may be sued in this District, and a substantial part of the events giving rise to the claims occurred here.

**FACTUAL BACKGROUND**

*A.*     *Content Creators, YouTube and Technological Protection Measures*

29.     As noted above, Plaintiffs and the Class Members are independent content creators of audiovisual content.

30.     Plaintiff TEI is the creator of the videos listed in Exhibit A.

31.     Plaintiff Matt Fisher is the creator of the videos listed in Exhibit B.

32.     Plaintiff Golfaholics, Inc. is the creator of the videos in Exhibit C.

33.     Plaintiffs and the Class Members create video content and upload their video content onto YouTube's video sharing platform.

34.     YouTube's "users"—the individuals who view the digital content available on YouTube—can watch and listen to music videos for free on YouTube's ad-supported service, but YouTube does not give users access to or allow downloading of the digital files for the content viewed by the user.

35.    YouTube deploys technological protection measures ("TPMs") designed to control access to the underlying video files and prevent direct downloading outside permitted channels (e.g., streaming-only delivery, application programming interface ("API") usage limits, and access controls).

36.    YouTube's Terms of Service expressly prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content except through expressly permitted features or licensed APIs.[1] These contractual restrictions operate together with TPMs to prevent unlicensed access to creators' videos.

37.    According to YouTube's Terms of Service, Content creators such as Plaintiffs who upload content onto YouTube grant license to YouTube for certain uses as well as to other users of YouTube to access content through YouTube's services; however, the license makes clear that it "does not grant any rights or permissions for a user to make use of [the] Content independent of the Service."[2]

38.    This language confirms that end users are not given access to the file itself, only the ability to view (i.e., stream) through YouTube's controlled environment. YouTube's Terms of Service reflect YouTube's intent to restrict access to the digital files underlying the videos that YouTube's users are allowed to stream through YouTube's platform.

39.    Streaming through YouTube and downloading permanent copies provide the user with different value propositions—watching and listening for free but seeing ads, versus possessing a permanent digital copy.

40.    Accordingly, scraping or bulk downloading is not merely copying material already provided; it is an act of unauthorized access to data files that YouTube affirmatively withholds from public download.

41.    In order to enforce its prohibitions on downloading content, YouTube does not provide a downloading option that is readily available to users.

---

[1] "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed December 10, 2025) (prohibiting "access[ing] the Service using any automated means (such as robots, botnets or scrapers) except (a) in the case of public search engines, in accordance with YouTube's robots.txt file; or (b) with YouTube's prior written permission").

[2] *Id.*

42.    Although YouTube does offer downloading options to customers who subscribe and pay for YouTube's "Premium" plan, YouTube also employs TPMs to prevent access for Premium customers. Specifically, YouTube prohibits all downloading audiovisual content except to the YouTube app. Further, the "download" option only makes audiovisual content available for offline streaming—it does not provide the Premium customer with access to the audiovisual files. Accordingly, the audiovisual files cannot be transferred to any other device, but remain only for streaming on the app. Finally, the files are only available for offline streaming for a limited amount of time, at which point they will become available only for online streaming once again.

43.    For users who do not have a "Premium" plan, the "download" option on YouTube's player page is non-functional.

44.    In order to further enforce its prohibitions on downloading content, YouTube uses technological processes and tools to detect and block unauthorized downloading. For example, YouTube occasionally updates APIs, which operate to interfere with downloaders utilizing the non-updated API to extract files. As another example, YouTube monitors downloading activity and may block IP addresses that make too many download attempts in a specified time period.

45.    YouTube's refusal to provide users with a readily available downloading option, along with the processes and tools YouTube employs operate to restrict users' ability to access audiovisual material, are part of the TPMs that YouTube has employed to prohibit access to audiovisual files.

46.    Content creators, including Plaintiff and Class Members, rely on the TPMs contained in YouTube's Terms of Service in deciding to upload their audiovisual content to YouTube. Content creators, including Plaintiffs and Class Members, expect that their works will not be copied at scale without consent and that any authorized uses will retain CMI so their identities and rights are preserved.

**B.    Defendant Improperly Obtained Millions of YouTube Videos to Train Its Foundational AI Model**

47.    As noted above, Defendant is the creator, owner and operator of the AI video generator, Make-A-Video.

48.     In order to feed, train, improve, and commercialize Make-A-Video, Defendant requires significant amounts of data, as a "large quantity of data is important to learn representations of more subtle, less common concepts in the world."[3]

49.     Make-A-Video was not a research tool or isolated project; it is Defendant's generative AI video model that specifically envisions "creators and artists" as its target market.[4] According to Defendant, "Make-A-Video sets the new state-of-the-art in T2V generation."[5]

50.     Because Make-A-Video is intended to target consumers in an already competitive field of AI text to video models, Defendant had an overwhelming incentive to acquire training data on an unprecedented scale. Rather than negotiate for lawful licenses, Defendant broke through YouTube's access protections to obtain the massive dataset necessary to fuel Make-A-Video and, by extension, Defendant's success in the field of AI text to video models.

51.     Defendant has invested in its Make-A-Video product and has also fundamentally collaborated on improving its generative capabilities. Particular to the current case, Defendant has sought to develop Make-A-Video so it is capable, among other things, of turning language prompts into audiovisual content. In other words, Defendant has sought to, and has had some success with, creating an AI product that accepts language instruction and produces a video based on that instruction.

52.     In order to adequately train its generative AI model, Defendant requires vast amounts of data—the more data, the better the AI product.

53.     Defendant obtained datasets from a variety of sources, including academic repositories, research compilations, and other large-scale video collections created by universities, corporations, and independent researchers. These datasets were treated by Defendant as raw material for Make-A-Video, even when the datasets were expressly licensed for academic or non-commercial use and prohibited commercial exploitation, redistribution, or any use that would

---

[3] Uriel Singer, Adam Polyak, Thomas Hayes, Xi Yin, Jie An, Songyang Zhang, Qiyuan Hu, Harry Yang, Oron Ashual, Oran Gafnli, Sonal Gupta, Yaniv Taigman, Meta AI; "Make-A-Video: Text-To-Video Generation Without Text-Video Data" (hereinafter referred to as "Meta AI Paper"), p. 1, Sept. 29, 2022, available at https://arxiv.org/abs/2209.14792 (last viewed December 5, 2025).
[4] Meta, "Introducing Make-A-Video: An AI system that generates videos from text," Sept. 29, 2022, available at https://ai.meta.com/blog/generative-ai-text-to-video/ (last viewed December 5, 2025).
[5] Meta AI Paper, p. 2.

involve downloading the underlying copyrighted works

54.     In order to acquire high-quality text-to-video generation, Defendant, directly and through agents, contractors, and affiliates, intentionally accessed large volumes of YouTube videos by scraping and/or using tools and workflows that bypass or evade YouTube's TPMs and usage restrictions, and then reproduced those videos to assemble training corpora for Defendant's AI models and services.

55.     "Scraping" content involves downloading audio and video files from a website, in this case YouTube, using an automation of some type.

56.     When Defendant scraped audio and video files from YouTube, Defendant did not simply download those files onto the YouTube app for offline streaming, as envisioned by YouTube's Premium plan. Instead, Defendant improperly accessed the actual audio and video files and downloaded those files into Defendant's own system, where Defendant had control over the files and where Defendant could store them indefinitely. These actions are inconsistent with YouTube's Premium plan.

57.     To fuel its scraping activities, Defendant obtained the HD-VILA-100M dataset.

58.     The HD-VILA-100M does not contain the actual videos or clips but instead provides pointers such as video identifiers and timestamp boundaries for approximately 100 million clips drawn from 3,098,462 unique YouTube videos.

59.     Upon information and belief, the HD-VILA-100M dataset was obtained through GitHub—a publicly available online code-sharing platform.

60.     Upon information and belief, the license agreement for the HD-VILA-100M dataset restricts the dataset to "academic use only," such that any use for commercial purposes would be unauthorized.

61.     In addition, upon information and belief, the GitHub license agreement prohibits distribution, reproduction, modification, or exploitation of the dataset content without the permission of the copyright owner, thus recognizing that copyright ownership resides with the original creators of the source material, including YouTube content creators such as Plaintiffs and the Class Members.

62.     Defendant was aware that the HD-VILA-100M dataset was for research purposes only but used the dataset for commercial development (i.e., "training") of its generative AI model.

63.     The HD-VILA-100M dataset is made up entirely of YouTube source material that must be downloaded from YouTube to be used for AI training. This dataset utilized by Defendant does not contain the videos themselves. A video dataset functions only as an index file that lists pointers such as URLs, YouTube IDs, or similar location identifiers, sometimes with limited metadata attached. A dataset contains no audiovisual files. To use any such dataset, a company must retrieve the actual video files by downloading them directly from YouTube. Doing so requires new copying of each copyrighted work and requires bypassing YouTube's technological restrictions, terms of service, and licensing limitations. The dataset merely identifies where the videos are located. All copying, downloading, and circumvention is performed by the user.

64.     The HD-VILA-100M dataset used by Defendant list thousands of specific timestamps within those videos that are designated as clips. A single YouTube video can be divided into many such clips, and each clip is treated as a separate training sample. As a result, the scraping process requires repeated retrieval of the same underlying video for each clip. This means the same copyrighted work is copied multiple times, from different starting and ending points, for the purpose of extracting each designated clip.

65.     To obtain any clip listed in the HD-VILA-100M dataset used by Defendant, the user must newly copy the underlying YouTube video at the specific timestamp identified for that clip. Each clip requires a separate retrieval of the source video, which results in a distinct act of copying. Because YouTube provides no lawful mechanism for downloading these works, every retrieval requires the user to circumvent YouTube's technological restrictions, terms of service, and licensing limits. The dataset provides only the video location and the start and end times for each clip. All downloading, copying, and circumvention occurs on a clip-by-clip basis, and each instance constitutes its own violation.

66.     The HD-VILA-100M dataset is comprised entirely of YouTube videos and contains 3,098,462 source videos that were divided into roughly 100 million clips. Each clip represents a distinct segment of the original work. The dataset was compiled by Microsoft Research Asia and

published in 2021 for research involving video-based AI models. It lists pointers to YouTube videos and includes subtitle information extracted from YouTube's closed captioning system.

67.    The HD-VILA-100M dataset does not provide the video files themselves. Any user of the dataset must download each referenced clip directly from YouTube. Defendant did so at scale, which triggered millions of separate acts of unauthorized access and copying.

68.    The usage license on the HD-VILA-100M dataset states it was created "solely for Computational Use for non-commercial research. This restriction means that you may engage in non-commercial research activities (including non-commercial research undertaken by or funded via a commercial entity), but you may not use the Data or any Results in any commercial offering, including as part of a product or service (or to improve any product or service) you use or provide to others."

69.    These limitations on the dataset's usage license is an implicit acknowledgment that the HD-VILA-100M dataset is comprised of protected, copyrighted works obtained without license, permission, or authorization.

70.    Defendant was aware that the dataset was for research purposes only but used the HD-VILA-100M dataset and other datasets for commercial development (i.e., "training") of its generative AI model.

71.    The HD-VILA-100M dataset consists of location identifiers that point to millions of YouTube videos or clips. The dataset does not contain the underlying audiovisual files. To use the audiovisual files in training, a company must retrieve and download every referenced video directly from YouTube. By targeting this dataset, Defendant initiated millions of individual downloads of protected YouTube content, all without authorization, all in violation of YouTube's access restrictions, and all for the commercial purpose of building its artificial intelligence video model.

72.    Defendant used the HD-VILA-100M dataset as the foundation for its own refined dataset known as HD-VILA-10M. To create this reduced version, Defendant selected only three clips from each of the 3,098,462 unique URLs in HD-VILA-100M. Meaning Defendant still had to download every underlying YouTube video in the HD- VILA- 100M dataset, likely multiple

times, listed in the original HD-VILA-100M dataset in order to extract those clips.[6]

73. Defendant used the HD-VILA-10M dataset to scrape audio and video content from YouTube without the knowledge or consent of YouTube or the creators of the content.

74. Defendant also obtained its own separate audio and video datasets directly through its own independent scraping of YouTube's video sharing platform without the knowledge or consent of YouTube or the creators of the content.

75. The scraping activities Defendant conducted on YouTube's video sharing platform required Defendant to use processes to defeat protections that YouTube put in place to prevent unauthorized access to the digital files underlying the audiovisual content. The processes used by Defendant to scrape audiovisual files from YouTube are not used in the ordinary course of YouTube's operations from the point of view of an ordinary consumer.

76. Upon information and belief, Defendant used tools and processes such as the open-source YouTube video downloader "yt-dlp" combined with virtual machines that refresh IP addresses to access audiovisual content from YouTube's platform. Such tools and processes are necessary for Defendant to avoid being blocked by YouTube.

77. The use of virtual machines to refresh IP addresses is necessary because YouTube uses programs to monitor the activity from IP addresses for downloading activity and block those IP addresses from accessing audiovisual data on the YouTube platform. Refreshing the IP addresses operates to defeat YouTube's monitoring programs.

78. The yt-dlp downloader is a tool used for downloading videos and audio from online platforms such as YouTube. The yt-dlp downloader can be used to automatically merge separate audio and video streams and download entire playlists, among other tasks, and Defendant used the yt-dlp downloader for these very purposes in downloading files from YouTube.

79. To use yt-dlp, Defendant first had to install the program, which can be downloaded from the official yt-dlp page on GitHub, along with other programs necessary to effectively download files, such as programs for merging video and audio files. Once installed, yt-dlp can be used to download individual files or entire playlists by adding the Uniform Resource Locator

---

[6] Meta AI Paper, p. 7.

("URL"), which is essentially a web address and mechanism for retrieving a specific file, for each desired video to the yt-dlp program.

80.     Defendant used programs such as yt-dlp to improperly access and download files and merge data in order to feed complete audiovisual packages to its generative AI model for training purposes.

81.     Processes such as these allowed Defendant to bypass YouTube's player page and avoid YouTube's monitoring systems in order to scrape content from YouTube, and feed content directly to its generative AI model.

82.     Defendant did not obtain the consent of YouTube, Plaintiffs or other creators of the audiovisual content to conduct its scraping activities.

83.     On information and belief, and based on the sheer volume of video data included, the dataset of videos that included YouTube videos were scraped without permission from YouTube and in violation of YouTube's Terms of Service.[7]

84.     The scraping and acquisition processes used by Defendant were inconsistent with, and in violation of, YouTube's Terms of Service, which forbid scraping and mass downloading of videos.[8]

85.     In fact, YouTube's CEO, Neal Mohan has stated that, "From a creator's perspective, when a creator uploads their hard work to our platform, they have certain expectations. One of those expectations is that the terms of service is going to be abided by," Mohan said. "It does not allow for things like transcripts or video bits to be downloaded, and that is a clear violation of our terms of service. Those are the rules of the road in terms of content on our platform."

86.     The automated system used by Defendant to access video content from YouTube was intentionally designed and utilized to circumvent YouTube's TPMs.

87.     To be clear, Defendant's generative AI model is not "watching" YouTube in order to be trained. Rather, data improperly accessed and downloaded from YouTube is being uploaded

---

[7] "Terms of Service," YouTube, https://www.youtube.com/t/terms (last viewed December 5, 2025) (prohibiting "access, reproduce, download, distribute, transmit, broadcast, display, sell, license, alter, modify or otherwise use any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders;").

[8] *Id.*

into Defendant's generative AI model in order to develop and improve Defendant's products.

88.    Defendant knew or should have known its conduct contravened YouTube's rules and the TPMs that enforce them.

89.    Despite its knowledge, Defendant continued its program of improperly accessing YouTube data and using the audiovisual content it improperly accessed to train its generative AI model.

### C.    *Defendant's Actions Were At All Times Commercially Driven*

90.    Defendant's efforts to train its generative AI products, including Make-A-Video, were not merely for "research" purposes, but rather primarily served Defendant's own commercial and financial interests.

91.    As noted above, Make-A-Video was not a research tool or isolated project, but rather is Defendant's generative AI video model that specifically envisions "creators and artists" as its target market.

92.    Defendant has numerous financial interests related to its generative AI products, such as Make-A-Video.

93.    Defendant is the owner of Facebook, a social media platform that allows users to network through posts that include text, photos and reels. Reels are video segments that individual users can post.

94.    Defendant is also the owner of Instagram, a photo and video-sharing platform that allows users to post images and video segments.

95.    Defendant maintains a website at https://meta.ai, which allows users to enter text to create video segments using a text-to-video process such as that described in the Meta AI Research Paper.

96.    Defendant's effort to train its generative AI product is commercially-driven.

97.    Defendant has at all times intended to create a well-trained generative AI product that Defendant can integrate into its existing technology and social media-based business structure, that will give Defendant an advantage in competition against its competitors in technology and social media spheres, and that Defendant can leverage for commercial purposes in order to increase

its own profitability.

### D.     Defendant's Actions Caused Harm to Plaintiff and Class Members

98.     At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization to access and use the videos Defendant used to train its generative AI models

99.     At no time did Defendant seek or obtain Plaintiffs' or Class Members' authorization, nor did Defendant compensate Plaintiffs or the Class Members for the access, copying, ingestion, and use of their YouTube videos in AI training and related workflows.

100.     Plaintiffs and Class Members used YouTube as their platform of choice to upload their video content in substantial part due to YouTube's terms and service that prohibit the type of scraping, unauthorized accessing and downloading, bulk extraction, and other forms of data mining of audiovisual content utilized by Defendant to obtain Plaintiffs' video content.

101.     Defendant intentionally violated Plaintiffs' and Class Members' intent and rights to their content by accessing Plaintiffs' and Class Members' video content to train Defendant's generative AI model.

### CLASS ACTION ALLEGATIONS

102.     Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated.

103.     Plaintiffs propose the following Class definition, subject to amendment as appropriate:

> **All persons and entities in the United States who uploaded original videos to YouTube and whose videos (or material portions thereof) were included in the HD-VILA-10M dataset scraped and downloaded by Defendant.**

104.     Excluded from the Class are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

1      105.    Plaintiffs reserve the right to amend or modify the class definition with greater

2  specificity or division after having an opportunity to conduct discovery. The proposed Class meets

3  the criteria for certification under Rule 23 of the Federal Rules of Civil Procedure.

4      106.    <u>Numerosity</u>. The Members of the Class are so numerous that joinder of all of them

5  is impracticable. The exact number of Class Members is unknown to Plaintiffs now, but Plaintiffs

6  estimate that there are thousands of Class Members.

7      107.    <u>Commonality</u>. There are questions of law and fact common to the Class, which

8  predominate over any questions affecting only individual Class Members. These common

9  questions of law and fact include, without limitation:

      a.  Whether Defendant used an automated tool to download or otherwise obtain video content created and uploaded by Plaintiffs and Class Members onto YouTube;

      b.  Whether Defendant's downloading of the video content was intended to bypass the TPMs put in place by YouTube without the authorization of Plaintiffs and Class Members;

      c.  Whether Defendant used Plaintiffs' and Class Members' content for purposes of training its generative AI models;

      d.  Whether Plaintiffs and Class Members suffered damages from Defendant's misconduct;

      e.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

108.    These issues are common to the Class, and their resolution would advance matter and the parties' interests therein.

109.    <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' video content, like that of every other Class Member, was made available on YouTube and improperly altered and used by Defendant to train Defendant's generative AI models for commercial purposes. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendant. Plaintiffs are advancing the same claims and legal theories on behalf of himself and all

other Class Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

110. <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

111. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that Plaintiffs' and Class Members' video content was unlawfully downloaded, altered and used by Defendant in the same way. Defendant's conduct was uniform across the Class: every video unlawfully accessed from YouTube was ingested into the same core model that underpins Defendant's product ecosystem. This commonality further demonstrates the predominance of shared legal and factual issues among Class Members. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

112. <u>Superiority</u>. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

113. Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

114. <u>Ascertainability</u>. Finally, all members of the proposed Class are readily

ascertainable. Defendant used a dataset that contain the full lists of URLs and video identifiers for every YouTube video incorporated into the training pipeline. Those identifiers allow the parties to determine exactly which videos were used and to match each video to its creator through YouTube's public channel and authorship information. Because the dataset provides a complete map of the videos Defendant downloaded, the identities of the affected creators are identifiable through straightforward reference to the URLs and corresponding channel data.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### *Violation of the DMCA (Anti-Circumvention) 17 U.S.C. § 1201(a)*

115.    Plaintiffs repeat, reallege, and incorporate the allegations contained in the previous paragraphs as if fully set forth herein.

116.    YouTube's Terms of Service prohibit scraping, unauthorized downloading, bulk extraction, or other forms of data mining of audiovisual content. These restrictions operate together with TPMs to prevent unlicensed access to the underlying video files, not simply reproduction of content.

117.    Plaintiffs and Class Members uploaded their original video content to YouTube's video sharing platform due in substantial part to YouTube's Terms of Service and TPMs prohibiting bulk downloading of creators' videos.

118.    Content creators, including Plaintiffs and Class Members, expect that their works will not be accessed at the file level and copied at scale without consent.

119.    YouTube's Terms of Service and associated access controls constitute "effective technological measures" within the meaning of 17 U.S.C. §1201.

120.    Defendant used automated tools for the sole purpose of circumventing YouTube's access barriers and extracting files never made available to the public. In doing so, Defendant improperly obtained millions of videos from YouTube's platform.

121.    This distinction is critical: viewing a YouTube video through YouTube's platform does not provide access to the underlying file. Defendant's circumvention tools broke through that access barrier, triggering liability under §1201.

122.    Defendant accessed, downloaded, stored and utilized those videos to assemble training corpora for Defendant's AI models and services.

123.    Each act of circumvention constitutes a separate violation of §1201. Plaintiffs and the Class Members are entitled to statutory damages, injunctive relief, impoundment, and attorneys' fees and costs under 17 U.S.C. §1203.

124.    Each of Defendant's acts of infringement is a willful violation as Defendant specifically utilized automated tools designed to evade YouTube's TPMs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request a judgment in their favor and against Defendant as follows:

A.    For a declaration that Defendant has willfully circumvented the copyright protection systems of YouTube intended to protect Plaintiffs' and the Class Members' audiovisual content.

B.    For statutory damages (up to the maximum allowed by law per violation), injunctive relief, and attorneys' fees and costs under 17 U.S.C. §1203;

C.    For such equitable relief under Title 17, Title 28, and/or the Court's inherent authority as is necessary to prevent or restrain infringement of Plaintiffs' and the Class Members' copyright-protected content, including a preliminary and permanent injunction requiring that Defendant and its officers, agents, servants, employees, attorneys, directors, successors, assigns, licensees, and all others in active concert or participation with any of them, cease infringing, or causing, aiding, enabling, facilitating, encouraging, promoting, inducing, or materially contributing to or participating in the infringement of any of Plaintiffs' or the Class Members' exclusive rights under federal law, including without limitation in the content identified in Exhibit A;

D.    For an award of Plaintiffs' costs and disbursements in this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

1       E.      For an award of pre-judgment and post-judgment interest, to the fullest
2               extent available, on any monetary award made part of the judgment against
3               Defendant; and
4       F.      For such other and further relief as the Court may deem just and proper.

5  **<u>JURY DEMAND</u>**

6       Plaintiff demands a trial by jury on all claims for which trial by jury is proper.

7  Dated: December 23, 2025           **HEAH BAR-NISSIM LLP**

8

9                     By  /s/ ROM BAR-NISSIM
                       ROM BAR-NISSIM

10                 **ELLZEY KHERKHER SANFORD**
**MONTGOMERY LLP**

11

12                 JARRET LEE ELLZEY
               TOM KHERKHER

13                 LEIGH S. MONTGOMERY
               NATISCHA VOLPE

14

15                 Attorneys for Plaintiffs

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT