LATHAM & WATKINS LLP
    Joseph R. Wetzel (SBN 238008)
    Andrew M. Gass (SBN 259694)
    Brittany N. Lovejoy (SBN 286813)
505 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: 415.391.0600
Email:  *Joe.Wetzel@lw.com*
        *Andrew.Gass@lw.com*
        *Britt.Lovejoy@lw.com*

LATHAM & WATKINS LLP
    Samir Deger-Sen (*pro hac vice* pending)
1271 Avenue of the Americas
New York, New York 10020
Telephone: 212.906.1200
Email:   *Samir.Deger-Sen@lw.com*

*Attorneys for Defendant Meta Platforms, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, GOLFHOLICS, INC., DEVIN YOUNGBLOOD, NICOLE CHMURA, and CHRIS RICE, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | CASE NO. 4:25-cv-10931-JST<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>The Honorable Jon S. Tigar<br>Hearing Date: July 9, 2026<br>Hearing Time: 2:00 pm<br>Courtroom: Courtroom 6 – 2nd Floor |

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## NOTICE OF MOTION AND MOTION

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR RESPECTIVE COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 9, 2026, at 2:00 pm, or as soon thereafter as the matter may be heard before the Honorable Jon S. Tigar of the United States District Court for the Northern District of California, at the Oakland Courthouse, Courtroom 6—2nd Floor, 1301 Clay Street, Oakland, CA 94612, Defendant Meta Platforms, Inc. ("Meta") by and through its undersigned counsel will, and hereby does, move this Court for an order dismissing Plaintiffs Ted Entertainment, Inc., Matt Fisher, Golfholics, Inc., Devin Youngblood, Nicole Chmura, and Chris Rice's First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6). Meta's Motion to Dismiss is based on this Notice, the supporting Memorandum of Points and Authorities below, and any additional material and arguments as may be considered in connection with the hearing.

Dated:  May 13, 2026

**LATHAM & WATKINS LLP**

By ____ */s/ Joseph R. Wetzel* ____
Joseph R. Wetzel (SBN 238008)
 *Joe.Wetzel@lw.com*
Andrew M. Gass (SBN 259694)
 *Andrew.Gass@lw.com*
Brittany N. Lovejoy (SBN 286813)
 *Britt.Lovejoy@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: 415.391.0600

Samir Deger-Sen (*pro hac vice* pending)
 *Samir.Deger-Sen@lw.com*
1271 Avenue of the Americas
New York, New York 10020
Telephone: 212.906.1200

*Attorneys for Defendant*
*Meta Platforms, Inc.*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................. 1

II. BACKGROUND ................................................................. 3

    A. Statutory Background ................................................. 3

        1. Access Controls vs. Copy Controls ........................... 4

        2. Act-of-Circumvention Prohibitions vs. Trafficking Prohibitions ................................................. 5

        3. Congress's Intentional, Differential Treatment of Access Controls and Copy Controls ................................. 6

    B. Factual Background ................................................. 8

    C. Procedural History ................................................. 9

III. LEGAL STANDARD ........................................................... 11

IV. ARGUMENT ................................................................. 12

    A. Plaintiffs Lack Article III Standing............................... 12

    B. Plaintiffs Are Not Authorized to Sue Under Section 1203(a) ........ 14

    C. Plaintiffs Fail to State a Claim Under Section 1201(a)............. 16

        1. YouTube's TPMs Are Not Access Controls....................... 17

        2. Plaintiffs' Attempt to Rewrite Section 1201(a)(1) Should Be Rejected ................................................. 21

V. CONCLUSION................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   744 F.3d 595 (9th Cir. 2014) ...................................................................................................25

*Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
   747 F.3d 673 (9th Cir. 2014) ...................................................................................................24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................................................11

*Bartz v. Anthropic PBC*,
   787 F. Supp. 3d 1007 (N.D. Cal. 2025) .....................................................................................1

*Chandler v. State Farm Mut. Auto. Ins. Co.*,
   598 F.3d 1115 (9th Cir. 2010) .................................................................................................11

*Chmura v. Snap Inc.*,
   No. 26-cv-1732 (C.D. Cal.) ......................................................................................................10

*Columbia Pictures Indus., Inc. v. Fung*,
   710 F.3d 1020 (9th Cir. 2013) ...........................................................................................20, 24

*Cordova v. Huneault*,
   817 F. Supp. 3d 819 (N.D. Cal. 2026) .....................................................................................10

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) ...................................................................................................14

*Disney Enters., Inc. v. VidAngel, Inc.*,
   869 F.3d 848 (9th Cir. 2017) ...................................................................................................18

*Echostar Satellite, L.L.C. v. Viewtech, Inc.*,
   543 F. Supp. 2d 1201 (S.D. Cal. 2008)....................................................................................24

*Ets-Hokin v. Skyy Spirits, Inc.*,
   225 F.3d 1068 (9th Cir. 2000) .......................................................................................4, 17, 21

*Food & Drug Admin. v. R.J. Reynolds Vapor Co.*,
   606 U.S. 226 (2025)..................................................................................................................14

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
   586 U.S. 296 (2019)..................................................................................................................13

*Google LLC v. Oracle Am., Inc.*,
   593 U.S. 1 (2021)......................................................................................................................24

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)................................................................................................13

*Hattler v. Ashton*,
    No. 16-cv-4099, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017)......................................21, 25

*I.C. v. Zynga, Inc.*,
    600 F. Supp. 3d 1034 (N.D. Cal. 2022) ................................................................................12

*Kadrey v. Meta Platforms, Inc.*,
    788 F. Supp. 3d 1026 (N.D. Cal. 2025) ..................................................................................1

*Kodadek v. MTV Networks, Inc.*,
    152 F.3d 1209 (9th Cir. 1998) ..............................................................................................24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ..............................................................................................................11

*London-Sire Recs., Inc. v. Doe 1*,
    542 F. Supp. 2d 153 (D. Mass. 2008) ..................................................................................22

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..........................................................................................................11, 15

*Matthew Bender & Co. v. W. Publ'g Co.*,
    158 F.3d 693 (2d Cir. 1998)..................................................................................................22

*Maya v. Centex Corp.*,
    658 F.3d 1060 (9th Cir. 2011) ..............................................................................................11

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
    629 F.3d 928 (9th Cir. 2010) ...................................................................................... *passim*

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*,
    795 F.3d 1124 (9th Cir. 2015) ................................................................................................9

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)..............................................................................................................22

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ..............................................................................................22

*Raw Story Media, Inc. v. OpenAI, Inc.*,
    756 F. Supp. 3d 1 (S.D.N.Y. 2024) ......................................................................................16

*Ray Charles Found. v. Robinson*,
    795 F.3d 1109 (9th Cir. 2015) ..............................................................................................15

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ..............................................................................................11

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

META'S MOTION TO DISMISS
CASE NO. 4:25-cv-10931-JST

*Silicon Image, Inc. v. Analogix Semiconductor*,
    642 F. Supp. 2d 957 (N.D. Cal. 2008) ..................................................................................14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..............................................................................................................11

*Sullivan v. Flora, Inc.*,
    936 F.3d 562 (7th Cir. 2019) ......................................................................................4, 17, 21

*Ted Ent., Inc. v. Amazon.com Inc.*,
    No. 26-cv-1134 (W.D. Wash.)...............................................................................................10

*Ted Ent., Inc. v. Apple, Inc.*,
    No. 26-cv-2936 (N.D. Cal.) ...................................................................................................10

*Ted Ent., Inc. v. ByteDance Inc.*,
    No. 25-cv-10933 (N.D. Cal.) .................................................................................................10

*Ted Ent., Inc. v. Nvidia Corp.*,
    No. 25-cv-10287 (N.D. Cal.) .................................................................................................10

*Ted Ent., Inc. v. OpenAI Inc.*,
    No. 26-cv-2935 (N.D. Cal.) ...................................................................................................10

*Ted Ent., Inc. v. Snap Inc.*,
    No. 26-cv-754 (C.D. Cal.) .....................................................................................................10

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)..................................................................................................11, 12, 13

*United States v. Elcom*,
    203 F. Supp. 2d 1111 (N.D. Cal. 2002) ..........................................................................5, 7, 8

*Universal City Studios, Inc. v. Corley*,
    273 F.3d 429 (2d Cir. 2001)..........................................................................................4, 5, 7, 21

*VidAngel LLC v. ClearPlay, Inc.*,
    703 F. Supp. 3d 1329 (D. Utah 2023).....................................................................................15

*Williams v. Gaye*,
    895 F.3d 1106 (9th Cir. 2018) ...............................................................................................24

*Youngblood v. Meta Platforms, Inc.*,
    No. 26-cv-1100 (N.D. Cal.) ...................................................................................................10

*Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*,
    633 F. Supp. 3d 650 (D. Conn. 2022), *appeal pending*, No. 22-2760 (2d Cir.) .................9, 10

## STATUTES

17 U.S.C.
§ 106(1)................................................................................................................5, 13, 23
§ 106(3)................................................................................................................13
§ 107................................................................................................................1, 3, 7
§ 411................................................................................................................1
§ 411(a)................................................................................................................13, 24
§ 412................................................................................................................1
§ 501(b)................................................................................................................13, 24
§ 504(c)(1)................................................................................................................24
§ 504(c)(2)................................................................................................................24
§ 1201(a)(1) ................................................................................................................ *passim*
§ 1201(a)(1)(A) ................................................................................................................ *passim*
§ 1201(a)(3)(A) ................................................................................................................4
§ 1201(a)(3)(B) ................................................................................................................ *passim*
§ 1201(b)(1)(A)................................................................................................................4, 5, 15
§ 1203(a)................................................................................................................14, 24

## OTHER AUTHORITIES

H.R. Rep. No. 105-551, pt. 1 (1998)................................................................................................................8, 17

Jessica D. Litman, Digital Copyright 131 (2d ed. 2006), available at
https://repository.law.umich.edu/books/1 ................................................................................................................6, 7

NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. § 1201 (1995) ................................................................6

*NII Copyright Protection Act of 1995: Hearing Before Subcomm. on Cts. & Intell.
Prop., pt. 2*, 104th Cong. 380 (1996) ................................................................................................................6

S. Rep. No. 105-190 (1998) ................................................................................................................ *passim*

U.S. Copyright Office, The Digital Millennium Copyright Act of 1998: U.S.
Copyright Office Summary (Dec. 1998),
https://www.copyright.gov/legislation/dmca.pdf................................................................................................................7

U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of
Copyrights (June 2017), https://copyright.gov/policy/1201/section-1201-full-
report.pdf................................................................................................................3, 4, 6, 23

Uriel Singer et al., Make-A-Video: Text-to-Video Generation Without Text-
Video Data ("MAV Paper") 1, 9-10, arXiv (Sept. 29, 2022),
https://arxiv.org/pdf/2209.14792 ................................................................................................................8

*WIPO Copyright Treaties Implementation Act; and Online Copyright Liability
Limitation Act: Hearing Before the Subcomm. on Cts. & Intell. Prop.* ("1997
Hearing"), 105th Cong. 48 (1997) ................................................................................................................5

## I.     INTRODUCTION

For several years, copyright plaintiffs have tried to hold companies liable for using their works without permission to train generative artificial intelligence ("AI") models, arguing that such use violates the Copyright Act. But the Copyright Act imposes prerequisites to bringing an infringement suit and securing statutory damages, including registration. *See* 17 U.S.C. §§ 411–12. And it prescribes limitations, most notably the fair use defense, *see id.* § 107, which has gained traction with courts considering whether using copyrighted content to train generative AI models is actionable, *see, e.g.*, *Kadrey v. Meta Platforms, Inc.*, 788 F. Supp. 3d 1026, 1060 (N.D. Cal. 2025); *Bartz v. Anthropic PBC*, 787 F. Supp. 3d 1007, 1033 (N.D. Cal. 2025). In search of an alternative theory of liability, Plaintiffs have turned to Section 1201(a) of the Digital Millennium Copyright Act ("DMCA").

Section 1201(a) prohibits circumvention of certain "access controls," i.e., "technological measure[s] that effectively control[] *access* to a work." 17 U.S.C. § 1201(a)(1) (emphasis added). The statutory text makes clear that this provision targets technologies that limit the ability to gain access to a work ("access controls"), such as a password-protected website, encrypted DVD, and pay-per-view platform. It does not apply to circumvention of technologies that restrict the copying of works to which access is freely given ("copy controls"). Congress intentionally made that distinction to prevent Section 1201 claims from metastasizing into super-copyright claims.

This case is precisely what Congress sought to prevent. Plaintiffs allege that Meta copied their public YouTube videos, without authorization and compensation, for use in AI training. They seek statutory damages and an injunction requiring Meta to "cease infringing" Plaintiffs' "exclusive rights" in "copyright-protected content." Dkt. 31 ("FAC") (Prayer for Relief). That is a copyright claim. Plaintiffs nonetheless seek to sidestep the Copyright Act's requirements by twisting Section 1201(a) to apply to technologies that freely permit access to a work, but inhibit copying that work (downloading). That theory erodes the foundational and intentional distinction at the heart of the statute. Indeed, if Plaintiffs are correct then virtually any copy control could be repurposed as an access control under Section 1201. Ultimately, the mismatch between the copyright claim Plaintiffs want to bring and the DMCA vehicle they have chosen dooms their

claim with respect to Article III standing, statutory standing, and the merits. Each is an independent reason to dismiss.

*First*, Plaintiffs have not identified a plausible, concrete, and particularized injury and thus cannot establish Article III standing. Plaintiffs allege that they suffered economic harm because, had Meta not downloaded their videos in bulk, Meta would instead have spent countless man-hours watching these millions of YouTube videos one-by-one, and Plaintiffs would have earned a nominal profit from these incremental hypothetical views. This alleged injury is entirely speculative and implausible, incompatible with Plaintiffs' allegations of how AI training occurs, and only underscores the lack of any real harm. Plaintiffs also allege that, because Meta chose not to license or otherwise pay for that use of Plaintiffs' content, they suffered harm to the market for their content and a loss of control over their digital files. But those are copyright injuries, and Plaintiffs did not bring a copyright claim. Nor have Plaintiffs plausibly alleged a real and immediate threat of repeated injury, as is required to seek an injunction.

*Second*, Plaintiffs lack statutory standing. To come within the zone of interest protected by Section 1201(a), Plaintiffs must allege an injury to their ability to control *access* to their videos—an interest that is distinct from the exclusive rights set out in Section 106 of the Copyright Act. *See MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 947 (9th Cir. 2010). But Plaintiffs have not done so. Instead, they allege violations of rights protected by only the Copyright Act and expressly allege that they sought to maximize—not restrict—access to their works. A claim grounded solely in copying cannot fall within the zone of interests protected by Section 1201(a).

*Third*, Plaintiffs' claim fails as a matter of law because they have not identified a technological measure that "controls access to a work," as Section 1201(a) requires. Subsection (a) bans the act of circumventing access controls, i.e., a technological measure that "requires the application of information, or a process or a treatment, . . . to *gain access to the work.*" 17 U.S.C. § 1201(a)(3)(B) (emphasis added). But as alleged in the FAC, YouTube does not restrict the ability of its users to "gain access to the work" in the first instance. Rather, YouTube uses five TPMs that permit streaming, watching, and listening to Plaintiffs' videos on YouTube for free and prohibit only "downloading permanent copies." FAC ¶ 72. This permitting of "access" and

prohibition of "use" is the hallmark of a copy control. Absent an allegation that YouTube prevented users from viewing, listening to, or otherwise accessing the works embodied in their videos, Plaintiffs have not identified an access control, and so their Section 1201(a) claim fails.

## II.    BACKGROUND

### A.    Statutory Background

The Copyright Act grants copyright owners certain "exclusive rights," 17 U.S.C. § 106, with certain limitations, including, as relevant here, fair use, *see id.* § 107. But copyright law "struggled through the years to keep pace with emerging technology." S. Rep. No. 105-190 ("Senate Rep."), at 2 (1998). The rise of the Internet increased "the ease with which digital works c[ould] be copied and distributed worldwide virtually instantaneously," resulting in copyright owners being "hesita[nt] to make their works readily available on the Internet." *Id.* at 8.

Congress wanted to "facilitat[e] the development of a lawful online marketplace for copyrighted works." U.S. Copyright Office, Section 1201 of Title 17: A Report of the Register of Copyrights ("USCO 2017 Rep.") 9 (June 2017), https://copyright.gov/policy/1201/section-1201-full-report.pdf. Specifically, it hoped to "encourag[e] copyright owners to make their works available in digital formats such as 'on-demand' or 'pay-per-view,' which allow consumers effectively to 'borrow' a copy of the work for a limited time or a limited number of uses." *MDY Indus.*, 629 F.3d at 947. Congress thus codified a new right to control access to a work in Section 1201(a), "independent of traditional copyright infringement." *Id.* at 946. And they separately "granted copyright owners a new weapon against copyright infringement" in Section 1201(b). *Id.* Section 1201(a) thus serves a limited purpose: to provide legal fortification for technological protection measures ("TPMs") that control *access* to a copyrighted work in the first instance, in the same way that breaking and entering is unlawful irrespective of what someone does once they are inside the house. *See* Senate Rep. at 12.

To further this purpose without intruding on the purview of the Copyright Act, the DMCA draws distinctions along two lines: (1) the types of TPMs, and (2) the kinds of acts that are deemed to violate the law.

### 1.    Access Controls vs. Copy Controls

Section 1201 "target[s] two distinct classes of" TPMs: access controls and copy controls. *Id.*

"Access controls" are governed by subsection (a) and "effectively control[] *access* to a work protected under this title." 17 U.S.C. § 1201(a) (emphasis added); USCO 2017 Rep. at 6. To "'control[] access'" is to "in the ordinary course of its operations, require[] the application of information, or a process or a treatment, with the authority of the copyright owner, to *gain access to the work*." 17 U.S.C. § 1201(a)(3)(B) (emphasis added). And the term "work" as used in Title 17 "refer[s] to the 'subject matter' that the act is designed to protect: 'original works of authorship.'" *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1079 (9th Cir. 2000). "[A] 'work'— as its name implies—reflects an original expression, whether in the form of art, literature, music, or another tangible medium of expression, that may be entitled to protection." *Sullivan v. Flora, Inc.*, 936 F.3d 562, 567–68 (7th Cir. 2019). A TPM that "controls access to a work" thus prevents the public from "gain[ing] access" to the original expression, such as by "encrypt[ing]" the content of a DVD so that it cannot be watched, or "scrambl[ing]" an audio file so that it cannot be played. 17 U.S.C. § 1201(a)(3)(A)–(B).

An access control is agnostic to the accessing party's ultimate use of the work, meaning that it does not necessarily prevent copyright infringement. *See MDY Indus.*, 629 F.3d at 945. It merely "*prevent[s] access* to a work" in the first instance. *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 441 (2d Cir. 2001); *see also* Senate Rep. at 12 (access controls "limit[] access to the plain text of a work"). The quintessential access control is a "password requirement limiting access to a website to paying customers." USCO 2017 Rep. at 6. It "'controls access'" by preventing anyone who lacks the "authority of the copyright owner" from "gain[ing] access to the work." 17 U.S.C. § 1201(a)(3)(B). A user who has the password can use it to view the works on the website, whereas a user who does not have the password cannot view the works at all.

"Copy controls," in contrast, are governed by subsection (b) and are "technological measure[s] that effectively protect[] a right of a copyright owner under this title in a work or a portion thereof." *Id.* § 1201(b)(1)(A). A TPM that "effectively protects a right of a copyright

holder" "prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title," *id.* § 1201(b)(2)(B), including the exclusive right to reproduce, *see id.* § 106(1). Unlike access controls, copy controls "do[] nothing to prevent access to . . . the work"; they are designed only "to prevent that work from being copied" after the fact. Senate Rep. at 12; *see also MDY Indus.*, 629 F.3d at 944–45 (similar). In short, copy controls "*permit access* to a work but *prevent copying* of th[at] work." *Corley*, 273 F.3d at 441. The quintessential copy control is "a technology that blocks users from downloading copies" of a work. *WIPO Copyright Treaties Implementation Act; and Online Copyright Liability Limitation Act: Hearing Before the Subcomm. on Cts. & Intell. Prop.* ("1997 Hearing"), 105th Cong. 48 (1997). Such a system is not an access control because it does not prohibit a user from viewing, listening to, or otherwise "gain[ing] access to the work." 17 U.S.C. § 1201(a)(3)(B). Instead, it prevents a user from creating an unauthorized reproduction of the work; that is, it "protects a right of a copyright owner." *Id.* § 1201(b)(1)(A).

### 2.    Act-of-Circumvention Prohibitions vs. Trafficking Prohibitions

Section 1201 also "create[s] two distinct types of claims": act-of-circumvention claims and trafficking claims. *MDY Indus.*, 629 F.3d at 944. Critically, the statute prohibits different conduct for access controls and copy controls. *See id.*

With regard to access controls, "Congress banned *both* the act of circumventing access controls *as well as* trafficking in and marketing of devices that are primarily designed for such circumvention." *United States v. Elcom*, 203 F. Supp. 2d 1111, 1119–20 (N.D. Cal. 2002) (emphasis added). Section 1201(a)(1), the act-of-circumvention prohibition, provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). Section 1201(a)(2), the anti-trafficking provision, prohibits the manufacture or sale of "any technology, product, service, device, component, or part thereof" that is "primarily designed or produced for the purpose of circumventing" an access control. *Id.* § 1201(a)(2).

Congress chose to treat copy controls differently: it banned only trafficking in devices primarily designed for circumvention but did *not* ban the act of circumvention itself. Thus, while subsection (b)'s trafficking prohibition mirrors that in subsection (a)(2), it contains no equivalent

provision to subsection (a)(1) prohibiting the circumvention of a copy control. *See id.* § 1201(b).

Subsections (a) and (b) are thus "not interchangeable." Senate Rep. at 12. Rather, access controls and copy controls are distinctly defined and governed by different statutory provisions. As summarized by the Copyright Office, Section 1201's statutory structure is as follows:

| 17 U.S.C. § 1201 | Circumvention Prohibition? | Trafficking Prohibition? |
| --- | --- | --- |
| Access Controls | Yes § 1201(a)(1) | Yes § 1201(a)(2) |
| Copy Controls | No | Yes § 1201(b) |

USCO 2017 Rep. at 7. Accordingly, any interpretation of what constitutes an access control, what constitutes a copy control, and, in rare circumstances, what constitutes both must not collapse this considered distinction between access and copy controls. *See MDY Indus.*, 629 F.3d at 946.

### 3. Congress's Intentional, Differential Treatment of Access Controls and Copy Controls

Section 1201's asymmetrical framework was no accident. When proposals for an anti-circumvention bill first came before Congress in 1995, the bill prohibited only trafficking in devices designed to circumvent TPMs that "inhibit[] the violation of any of the exclusive rights" protected by copyright. NII Copyright Protection Act of 1995, H.R. 2441, 104th Cong. § 1201 (1995). Legacy media groups wanted to go even further and lobbied for a sweeping prohibition, backed by criminal sanctions, on the act of circumventing copy controls. *See, e.g.*, *NII Copyright Protection Act of 1995: Hearing Before Subcomm. on Cts. & Intell. Prop., pt. 2* ("1996 Hearing"), 104th Cong. 380 (1996) (Viacom arguing that Congress should prohibit the "actual circumvention" of "anti-copying" measures); *id.* at 494 (RIAA coalition arguing for "criminal penalties" for "use of protection-defeating technology"); *see also* Jessica D. Litman, Digital Copyright 131 (2d ed. 2006), available at https://repository.law.umich.edu/books/1.

But technology industry representatives, among others, noted that such a broad prohibition would "impede 'legal' copying"—namely, fair use. 1996 Hearing at 149; *see also id.* at 83, 432

(tech coalitions arguing that "any 'anti-circumvention' provision must be carefully drafted so as not to prevent legitimate activities"); *id.* at 543 (noting that fair use is a prototypical example of the public being able to "make copies of [a] work without infringing the copyright"); Litman, *supra*, at 132 (industry groups argued that "[i]f the reason a person circumvented a copy protection measure was to make fair use of the protected work, then that circumvention should itself be legal"). Prohibiting *any* circumvention of copy controls would prohibit and chill activity that the fair-use doctrine expressly authorizes.

To protect "the continued ability to make fair use of copyrighted works," Congress enacted an asymmetrical framework that clearly distinguishes between access controls and copy controls. U.S. Copyright Office, The Digital Millennium Copyright Act of 1998: U.S. Copyright Office Summary ("USCO 1998 Rep.") 4 (Dec. 1998), https://www.copyright.gov/legislation/dmca.pdf. As explained, the statute prohibits the circumvention of access controls. *See supra* at 5. But "[s]ince copying of a work may be fair use under appropriate circumstances, section 1201 does not prohibit the act of circumventing a [copy control]." USCO 1998 Rep. at 4.

The justification for the "compromise" reflected in the resulting statutory framework is straightforward. Litman, *supra*, at 133–34. Any copyright owner has the baseline right to decide when and how to make her work accessible to the public—e.g., whether to keep a newly written book under "lock and key," whether to "show it to others selectively," or whether to make it freely available for public access. 1997 Hearing at 49 (testimony of Marybeth Peters, Register of Copyrights). Access controls are simply another way to implement this decision, and prohibiting their circumvention is nothing more than another way to "back[]" the choice to withhold access *ab initio* "with legal sanctions." *Corley*, 273 F.3d at 435.

But once a copyright owner decides to make a work accessible to the public, whether someone can copy it depends not on the copyright owner's preference, but on the Copyright Act, which encompasses the doctrine of fair use. *See* 17 U.S.C. § 107; *see also Elcom*, 203 F. Supp. 2d at 1121 (fair use "allow[s] a certain amount of direct copying for certain uses, without the permission of the copyright owner and notwithstanding the copyright owner's exclusive

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

rights"). Copyright holders and the platforms that host their works are free to implement TPMs that prevent copying as a technical matter. *See* H.R. Rep. No. 105-551, pt. 1 ("House Rep."), at 19 (1998). Indeed, Congress encouraged such self-help, by prohibiting trafficking in tools designed to allow others to circumvent copy controls. But prohibiting the circumvention of copy controls outright would have amounted to a strict legal prohibition on copying any time a work is protected by a copy control, even if that copying would otherwise be explicitly authorized under the doctrine of fair use. By enacting Section 1201's asymmetrical regime, "Congress expressly disclaimed any intent to impair any person's rights of fair use." *Elcom*, 203 F. Supp. 2d at 1120–21. And it affirmed that the remedies for circumventing copy controls, if any, are governed by the Copyright Act—not the DMCA. *See MDY Indus.*, 629 F.3d at 947.

In short, the statutory scheme reflects Congress's differential, but intentional, treatment of access controls and copy controls. Whereas Section 1201(a) prohibits the circumvention of access controls, Congress deliberately chose not to impose liability for efforts to circumvent copy controls—ensuring that copyright law would be the exclusive avenue of recovery for rightsholders claiming injury from the copying of their work. *See* Senate Rep. at 12 ("[T]here is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1)."); House Rep. at 18 (similar); *MDY Indus.*, 629 F.3d at 945–46 (similar).

### B.    Factual Background

Meta has developed several state-of-the-art generative AI systems that permit users to turn text prompts into brief video clips. FAC ¶¶ 2, 81, 83. To ensure high performance of its systems, Meta trains them using a large quantity of data. *See id.* ¶¶ 79, 84; Uriel Singer et al., Make-A-Video: Text-to-Video Generation Without Text-Video Data ("MAV Paper") 1, 9–10, arXiv (Sept. 29, 2022), https://arxiv.org/pdf/2209.14792. Meta is careful to limit the risk of any harm associated with its AI systems. For example, its training data "remove[s] NSFW content and toxic words." MAV Paper at 10.

YouTube is a "video sharing platform" on which all "members of the public" can "watch and listen to videos for free." FAC ¶¶ 36–37, 41. Plaintiffs are "content creators" who upload videos to YouTube for the express purpose of taking advantage of YouTube's public-facing nature,

*id.* ¶ 8; they "distribute[] [their videos] to the public via YouTube," "invest[] substantial time and money into bringing awareness around [their] content," and "deriv[e] value via viewership" of their videos, *id.* ¶¶ 18–19, 21–25.

When uploading videos to YouTube, Plaintiffs agree to YouTube's Terms of Service and "grant [a] license to YouTube for certain uses" and a license to "each other user of [YouTube]" to "access [their] Content through [YouTube's] Service." *Id.* ¶ 70; Terms of Service, YouTube, https://www.youtube.com/t/terms.[1] But they "do[] not grant any rights or permissions for a user to make use of [the] Content independent of the Service." FAC ¶ 70 (quoting Terms of Service). In other words, YouTube users *can* "access" videos by "watching and listening" to them "for free" on YouTube's platform; but they cannot "use" the videos, such as by "downloading permanent copies" of them. *Id.* ¶ 72. According to Plaintiffs, YouTube uses five TPMs to reinforce this divide between "[s]treaming through YouTube and downloading permanent copies." *Id.* Specifically, they allege that YouTube uses these TPMs to "prohibit[] . . . making permanent unrestricted copies," without affecting a user's ability to "'stream' content." *Id.* ¶ 103; *see also id.* ¶ 46 (TPMs "prevent[] download[ing]" and "limit[] a user to streaming").

## C.    Procedural History

Faced with the requirements and limitations associated with pursuing a claim for copyright infringement imposed by the Copyright Act, such as the fair use defense, aspiring plaintiffs have sought an alternative theory of liability to wield against AI companies who allegedly use their works without permission. They found one candidate in a September 2022 opinion from a district court in Connecticut denying a request for a declaratory judgment that a plaintiff's maintenance of and trafficking in a software tool that allowed users to enter a YouTube video URL and download the audio content from that video as an MP3 file, did not violate Section 1201(a). *Yout, LLC v. Recording Indus. Ass'n of Am., Inc.*, 633 F. Supp. 3d 650, 662 (D. Conn. 2022), *appeal pending*, No. 22-2760 (2d Cir.). This opinion suggested for the first time in the DMCA's 28-year history that a technology that controls a means of copying but not access constitutes an access control.

---

[1]    The Terms of Service are "cited repeatedly in the complaint" and are thus "incorporated by reference." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1127 n.1 (9th Cir. 2015); *see, e.g.*, FAC ¶¶ 69–78 & n.1.

The parties in *Yout* did not brief or argue the statutory distinction between access and copy controls, leading to an opinion that failed to analytically distinguish between the two on a critical, threshold question. *Id.* For this reason, the Second Circuit granted a motion to file an out-of-time amicus brief in support of neither party so this issue, which had begun to emerge in lawsuits brought against developers of AI technology, could be properly briefed and considered. *See* Dkt. 124, *Yout*, No. 22-2760 (2d Cir. Oct. 10, 2025) (motion order); Dkt. 127, *Yout*, No. 22-2760 (2d Cir. Oct. 10, 2025) (amicus brief).

In the meantime, a handful of district courts, including one in this district, have relied on *Yout* and ruled on Section 1201 claims without analyzing the distinction between access and copy controls. *See, e.g.*, *Cordova v. Huneault*, 817 F. Supp. 3d 819, 832–35 (N.D. Cal. 2026). A flurry of new lawsuits asserting Section 1201(a) claims followed. Plaintiffs alone have brought at least eight lawsuits alleging nearly identical facts against AI developers, all predicated on the *Yout* district court's erroneous conflation of access and copy controls. *See, e.g.*, *Ted Ent., Inc. v. Snap Inc.*, No. 26-cv-754 (C.D. Cal.); *Chmura v. Snap Inc.*, No. 26-cv-1732 (C.D. Cal.); *Ted Ent., Inc. v. Nvidia Corp.*, No. 25-cv-10287 (N.D. Cal.); *Ted Ent., Inc. v. ByteDance Inc.*, No. 25-cv-10933 (N.D. Cal.); *Ted Ent., Inc. v. Amazon.com Inc.*, No. 26-cv-1134 (W.D. Wash.); *Ted Ent., Inc. v. OpenAI Inc.*, No. 26-cv-2935 (N.D. Cal.); *Ted Ent., Inc. v. Apple, Inc.*, No. 26-cv-2936 (N.D. Cal.).

In this version, Plaintiffs Ted Entertainment, Inc., Matt Fisher, and Golfholics, Inc. brought a putative class action, alleging that Meta "bypass[ed] or evade[d]" certain unidentified TPMs and "improperly access[ed] and download[ed] files" from YouTube to train its AI, in violation of Section 1201(a)(1) of the DMCA. Dkt. 1 ¶¶ 54, 80–81. Pursuant to stipulation, *see* Dkt. 30, Plaintiffs filed the FAC on April 22, 2026, adding Devin Youngblood, Nicole Chmura, and Chris Rice as Plaintiffs.[2] The FAC, brought on behalf of all individuals "whose videos were posted on YouTube" and allegedly scraped by Meta, alleges a single count under Section 1201(a)(1). FAC ¶¶ 155, 168–84. Specifically, Plaintiffs allege that Meta used "automated tools," such as yt-dlp and IP rotators, to "circumvent[]" YouTube's TPMs and "scrap[e] and download[] files" from

---

[2]  Youngblood, Chmura, and Rice had separately brought a similar case against Meta, which was voluntarily dismissed prior to filing the FAC. *See Youngblood v. Meta Platforms, Inc.*, No. 26-cv-1100 (N.D. Cal.).

YouTube to train AI. *Id.* ¶¶ 6–7, 174–75. Plaintiffs seek statutory damages and an incongruous injunction requiring Meta to "cease infringing . . . any of Plaintiffs' or the Class Members' exclusive rights under federal law." *Id.* (Prayer for Relief).

## III.   LEGAL STANDARD

Article III standing "addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). To adequately plead standing, a plaintiff bears the burden of alleging an injury in fact caused by the defendant that is redressible by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The injury must be "(a) concrete and particularized; and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). If the complaint does not "'clearly allege facts demonstrating' each element," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up), or if "the allegations contained in a complaint are insufficient on their face" to establish standing, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004), the complaint must be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).

When a cause of action derives from statute, a plaintiff must also allege statutory standing; that is, that their "interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted). Lack of statutory standing requires dismissal for failure to state a claim under Rule 12(b)(6). *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must also "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is "'plausible'" when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Allegations merely "consistent with" liability, or where "more likely explanations" exist, are insufficient. *Id.* at 681. Nor are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678.

## IV.    ARGUMENT

### A.    Plaintiffs Lack Article III Standing

To establish Article III standing, a plaintiff must allege "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 594 U.S. at 423. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing . . . for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 431. Here, Plaintiffs seek statutory damages and an injunction "requiring that Defendant . . . cease infringing . . . any of Plaintiffs' or the Class Members' exclusive rights under federal law." FAC (Prayer for Relief). Plaintiffs allege two categories of injuries without differentiating which applies to their claim for damages and their request for an injunction. In any case, neither establishes standing for either form of relief.

*First*, Plaintiffs' alleged economic injuries are entirely implausible. According to Plaintiffs, had Meta not downloaded in bulk their videos from YouTube, Meta would have watched them all instead. *See id.* ¶¶ 144–47. These incremental, hypothetical additional views from Meta, Plaintiffs allege, would have generated additional advertising and YouTube Premium subscription revenue for Plaintiffs and increased their "monetization prospects" and "algorithmic amplification." *Id.*

It is entirely speculative and implausible to suggest that, in an alternative universe, Meta would have watched, one-by-one, the millions of YouTube videos it allegedly downloaded. *See I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1052 (N.D. Cal. 2022) ("[N]o Article III standing exists if a plaintiff's theory of injury rests on an 'attenuated chain of inferences necessary to find harm.'" (citation omitted)). And regardless, Plaintiffs' premise is fatally undermined by their own allegation that Meta "must *download*"—rather than watch—YouTube videos in order to train its AI, which is the alleged purpose of the exercise. FAC ¶ 108 (emphasis added); *see also id.* ¶¶ 98, 111. There is simply no plausible allegation that, but for Meta's alleged circumvention, Meta would be *watching* millions of videos, generating incremental revenue for one or at most a handful of additional views of each of Plaintiffs' videos.

*Second*, Plaintiffs' alleged injuries to their right to control the use and distribution of their works are, at best, copyright injuries that are not cognizable under Section 1201(a).  *See MDY Indus.*, 629 F.3d at 945–46 ("infringement of a copyright owner's traditional exclusive rights under [Section] 106" not cognizable under Section 1201(a)).  Plaintiffs allege that by "download[ing] a copy" of their works "for free" rather than licensing or otherwise "purchas[ing] a copy," Meta caused "harm to the market for [their] content" and "loss of control over digital files embodying copyrighted works."  FAC ¶¶ 148–49.  These alleged injuries are "concrete harm[s]" only if Plaintiffs plausibly allege that they are exclusive rightsholders *entitled* to a licensing market for their videos or to otherwise control the distribution of their videos for "compensation."  *Id.* ¶ 149; *TransUnion*, 594 U.S. at 427–28.

But Plaintiffs have not alleged that they are so entitled.  The only plausible source of these rights is Section 106 of the Copyright Act, which gives copyright owners "a bundle of exclusive rights," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985), including the rights "to reproduce the copyrighted work" and "distribute copies . . . of the copyrighted work to the public by sale," 17 U.S.C. § 106(1), (3).  The Copyright Act sets out how these exclusive rights can be vindicated: the "owner of an exclusive right under a copyright" can bring an action for copyright infringement, "subject to the requirements of section 411."  17 U.S.C. § 501(b); *see also Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296, 301 (2019) (a copyright owner "institute[s] a civil action for infringement of [his] exclusive rights" by bringing an action under Section 501(b)).

But here, Plaintiffs do not bring a claim for copyright infringement or otherwise allege that they possess the exclusive rights set out in Section 106.  Nor could they, given their concession that "[m]ost YouTube videos are not registered with the U.S. Copyright Office," FAC ¶ 13, a prerequisite to suing to enforce ownership rights, *see* 17 U.S.C. § 411(a), and obtaining statutory damages under the Copyright Act, *see id.* § 412.  But they nevertheless "seek[] an injunction and damages commensurate with the scope of Defendant's . . . *infringement*."  FAC ¶ 17 (emphasis added); *see also id.* (Prayer for Relief) (seeking injunction requiring Meta to "cease infringing").  Plaintiffs cannot seek a windfall under the DMCA for violations of rights granted exclusively by

the Copyright Act without alleging an entitlement to these rights.  Absent any plausible claim that the DMCA obligated Meta to seek permission from Plaintiffs and pay them for the alleged use of their videos, Plaintiffs have suffered no "concrete injury" from Meta's alleged failure to do so.

*Finally*, Plaintiffs lack standing for their claim of injunctive relief for an additional, independent reason: they have not plausibly alleged "a real and immediate threat of repeated injury," as is required to seek an injunction.  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (citation omitted); *see also Silicon Image, Inc. v. Analogix Semiconductor*, 642 F. Supp. 2d 957, 966 (N.D. Cal. 2008) ("[A] copyright plaintiff is entitled to a permanent injunction when liability has been established and there is a threat of continuing violations." (cleaned up)). Here, the FAC does not allege any future harm whatsoever, let alone an immediate threat of repeated circumvention of an access control.  Plaintiffs allege only that Meta "scraped," past tense, videos from YouTube, FAC ¶¶ 15, 17, 122, and "used," past tense, these files to train a generative AI model, *id.* ¶¶ 8, 12; *see also id.* ¶¶ 17, 84 ("trained").  Having failed to allege any likelihood of future harm, Plaintiffs do not have standing to seek injunctive relief.

### B.      Plaintiffs Are Not Authorized to Sue Under Section 1203(a)

Plaintiffs' claim should also be dismissed for lack of statutory standing.  Section 1201(a) protects the right to control *access* to a work—a right distinct from the copyright interests under the Copyright Act.  But all of Plaintiffs' alleged injuries stem from Meta's alleged "downloading" of Plaintiffs' videos for "use" in AI training without "authorization" or "compensation."  *Id.* ¶¶ 140–49.  These are, at best, property injuries cognizable under the Copyright Act.  *See supra* at 13–14.  They fall outside the zone of interests that Section 1201(a) seeks to protect and are thus not cognizable under Section 1201(a) and Section 1203(a).

Section 1203(a) creates a cause of action for a violation of Section 1201: "Any person injured by a violation of Section 1201 or 1202 may bring a civil action . . . for such violation."  17 U.S.C. § 1203(a).  "To invoke a statutory cause of action, a plaintiff must be within the 'zone of interests' that the statute protects."  *Food & Drug Admin. v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 232 (2025) (citation omitted).  "Put differently, a plaintiff must belong to the class of persons to whom the statute grants a right to sue."  *Id.*  This "zone of interests" inquiry asks not whether a

claim can be maintained in the abstract—but whether it can "be maintained *by the party asserting it*." *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1121 (9th Cir. 2015) (emphasis added); *cf. Lujan*, 504 U.S. at 560 (plaintiffs must establish "a causal connection between the injury and the conduct complained of"). Plaintiffs have not alleged an injury to their ability to control access to their works and thus are not within the "zone of interests" that Section 1201(a) protects.

The interests protected by Section 1201(a) are clear from its text and legislative history: to protect the right to control *access* to a work. *See MDY Indus.*, 629 F.3d at 947 (Section 1201(a) is "designed to protect access to a copyrighted work" (citation omitted)); *VidAngel LLC v. ClearPlay, Inc.*, 703 F. Supp. 3d 1329, 1334–35 (D. Utah 2023) ("Section 1201 is plainly meant to encourage technological measures that control access to a copyrighted work.").

Starting with the statutory text, Section 1201(a) addresses TPMs that "effectively control[] access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). The text refers to only a right to "control[] access" and does not "refer[] to traditional copyright infringement under [Section] 106." *MDY Indus.*, 629 F.3d at 945. Subsection (a) stands in contrast to subsection (b), which addresses TPMs that "effectively *protect[] a right of a copyright owner* under this title in a work or a portion thereof." 17 U.S.C. § 1201(b)(1)(A) (emphasis added). Whereas subsection (b) reinforces the rights of a copyright owner to control unauthorized copying, subsection (a) protects the distinct right to control access to the work itself.

The legislative history confirms this. When enacting Section 1201(a), Congress was "concerned with encouraging copyright owners to make their works available in digital formats such as 'on-demand' or 'pay-per-view,' which allows consumers effectively to 'borrow a copy of the work for a limited time or a limited number of uses.'" *MDY Indus.*, 629 F.3d at 947. To encourage this behavior, Congress "extend[ed] a new form of protection" to copyright owners— "the right to prevent circumvention of access controls." *Id.* at 945. But as both the Senate and House confirmed, this "new anticircumvention right" is "independent of traditional copyright infringement." *Id.* at 946. Conduct that triggers Section 1201(a) liability, such as "bypassing a password and breaking into a locked room in order to read or view a copyrighted work," does "not infringe on any of the copyright owner's exclusive rights under [Section] 106." *Id.* at 947.

To come into the zone of interests protected by Section 1201(a), therefore, Plaintiffs must allege an injury to the ability to control access to their works—not an injury to their exclusive rights, if any, under Section 106. *See* 4 Nimmer on Copyright § 12A.12 (Section 1203 "limits standing to parties actually injured by the pertinent violation" ); *Raw Story Media, Inc. v. OpenAI, Inc.*, 756 F. Supp. 3d 1, 6 (S.D.N.Y. 2024) ("[T]he [DMCA's] purpose was not to guard against property-based injury."). Plaintiffs have not done so. Instead, as explained, Plaintiffs allege violations of rights granted only by the Copyright Act and allege injuries redressable only under the Copyright Act. *See supra* at 13–14.

That Plaintiffs fall outside the zone of interests protected by Section 1201(a) is underscored by Plaintiffs' allegations that they sought to *maximize* access to their works on YouTube. They intentionally "upload[ed] their audiovisual content to YouTube" for "distribut[ion] to the public," FAC ¶¶ 8, 25; "invested substantial time and money into bringing awareness around [their] content"; and successfully "amassed . . . substantial following[s] on YouTube" and drew attention to their videos, which have a combined billions of views, *id.* ¶¶ 18, 21, 23. Plaintiffs further concede that when they uploaded their videos to YouTube, they agreed to its Terms of Service, *id.* ¶ 70, and granted a license to "each other user of [YouTube] . . . to access [their] Content through [YouTube's] Services," Terms of Service. This license to "access" permits all members of the public to "watch[] and listen[]" to Plaintiffs' content "for free." FAC ¶ 72. In short, Plaintiffs put their videos on YouTube *for the purpose of being accessed* as often as possible and by as many people as possible to generate as much revenue for Plaintiffs as possible. They thus cannot have suffered an injury to an unexercised right to limit access to their videos under Section 1201(a).

### C.    Plaintiffs Fail to State a Claim Under Section 1201(a)

To state a claim under Section 1201(a), Plaintiffs must identify "a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). "[A] technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of a copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). As explained, such a measure must prevent the public from viewing, reading, or otherwise "gain[ing] access to

the work," *id.*—such as by "encrypt[ing]" the content of a DVD so that it cannot be watched, "scrambl[ing]" an audio file so that it cannot be played, or imposing a password requirement on a website so that its content cannot be viewed absent the password, *id.* § 1201(a)(3)(A); *see supra* at 4. And the term "work" as used in Title 17 is the "original expression . . . entitled to protection." *Sullivan*, 936 F.3d at 567–68; *see also Ets-Hokin*, 225 F.3d at 1079 (similar).

This statutory definition makes clear that the key conduct a relevant measure must control is "gain[ing] access to the work" in the first place. 17 U.S.C. § 1201(a)(3)(B). In other words, a TPM that "controls access to a work" is a digital lock that must be opened before a user can read, view, listen to, or otherwise access the original expression at all. Once a user has "gain[ed] access to the work," *id.*, Section 1201(a) falls away, even if the user "circumvent[s] . . . additional forms of technological protection measures" restricting the use of the work, House Rep. at 18.

Plaintiffs allege that Meta violated Section 1201(a) by circumventing five YouTube TPMs that prohibit "unauthorized downloading." FAC ¶ 38. But a TPM that prohibits only downloading by definition does not "control[] access to a work," 17 U.S.C. § 1201(a)(1)(A), and thus cannot support Plaintiffs' Section 1201(a) claim.

### 1.    YouTube's TPMs Are Not Access Controls

Plaintiffs have not identified a TPM that "controls access to a work." *Id.* They allege that YouTube has TPMs that "prevent[] download[ing]." FAC ¶ 46. But they do not allege that YouTube has TPMs that "require[] the application of information, or a process or a treatment, . . . to *gain access to the work*." 17 U.S.C. § 1201(a)(3)(B) (emphasis added). As the Ninth Circuit has observed, access controls affect whether "someone [can] watch or listen to a work." *MDY Indus.*, 629 F.3d at 945. Here, Plaintiffs *concede* that YouTube's TPMs permit users to "watch and listen to videos for free on YouTube[]." FAC ¶ 37. And YouTube's Terms of Service expressly state that individuals, like Plaintiffs, who upload their content to YouTube, grant a "license" to "each other user of [YouTube]" to "*access* [this] Content through [YouTube's] Service." Terms of Service (emphasis added). Plaintiffs' "circumvention" allegations further reinforce that Meta did not circumvent any access control. Plaintiffs, for example, do not allege that Meta viewed works that it did not have permission to view or viewed works outside of

YouTube's authorized platform. To the contrary, Plaintiffs allege that they were harmed because Meta did *not* watch their videos. FAC ¶¶ 144–47.

The allegations in the FAC underscore that none of the TPMs operates as an access control:

Rolling Cipher: Every video on YouTube has two URLs: (1) a "page URL," which is "visible to the user" and links to "the webpage where the video playback occurs"; and (2) a "file URL," which is "not visible to the user" and links to "the video file itself." *Id.* ¶ 55. Plaintiffs allege that the rolling cipher encrypts the file URL "to impede external access to the underlying YouTube media files," i.e., to "restrict[] downloading." *Id.* They further allege that Meta circumvented the rolling cipher by decrypting the file URL to "download[], copy[], or distribut[e] . . . the audiovisual content." *Id.* ¶¶ 55, 124. But according to Plaintiffs, the rolling cipher does not encrypt the page URL or otherwise affect the experience of *watching* videos on YouTube. That is, a user does not need to do anything—much less apply any information, process or treatment—to watch a YouTube video. The rolling cipher is thus not an access control.

IP-Based Blocking and Rate Limiting Triggered by Excessive Downloading: When a particular IP address "make[s] too many download attempts in a specific period," YouTube "blocks that IP address from accessing the YouTube platform entirely." *Id.* ¶¶ 38, 57. The block is not triggered by watching or streaming videos (i.e., accessing), but by excessive downloading (i.e., copying). Importantly, Plaintiffs do not allege that Meta circumvented the TPM by somehow "gain[ing] access" to YouTube's platform after its IP address was blocked. 17 U.S.C. § 1201(a)(3)(B). Rather, they contend that once the technology is triggered, it is impossible to "access YouTube's content at all." FAC ¶¶ 57–58. Rather, they allege that Meta used an IP rotator to download at scale, without triggering the block at all. *Id.* ¶¶ 63, 129. According to Plaintiffs, therefore, Meta circumvented a technology designed to penalize making "too many download attempts" or downloading in "bulk" because they were able to avoid this penalty. *Id.* ¶¶ 38, 63, 119. But, as a result, the alleged access control component of the TPM penalty was never imposed (let alone circumvented); and the only thing that was allegedly circumvented was an attempt to prevent copying. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 864 (9th Cir. 2017) (TPM was access control insofar as it required decryption to "watch" DVD using "unlicensed

DVD player," but copy control insofar as it required decryption to "reproduce[]" or "cop[y]").

Short-Lived, Session-Bound Streaming URLs: Plaintiffs allege that every video on YouTube has two URLs: (1) a link to "where the video playback occurs," and (2) a link to "the video file itself." FAC ¶ 55. Whereas the latter is a permanent link, the former is a temporary link "tied to a particular playback session." *Id.* ¶¶ 59–60. When a user watches a video on YouTube, YouTube provides them with only the temporary link to "where the video playback occurs"—and not a permanent link to "the video file itself." *Id.* ¶¶ 55, 59. By providing users with only the temporary link, YouTube prevents users from being able to download the video file itself using "a static link." *Id.* ¶ 60. In other words, Plaintiffs allege that YouTube is set up to make it more difficult to *copy* videos that a user is free to access. Indeed, Plaintiffs acknowledge that the use of these temporary URLs affects only users who attempt to "retriev[e] [the video] files in a manner not available to ordinary users," such as by downloading (i.e., copying). *Id.* And they likewise acknowledge that the use of these links does not affect the experience of an average user within the "ordinary playback" environment—i.e., viewing and streaming videos on YouTube. *Id.*

CAPTCHA Challenges Triggered by Excessive Downloading: When "traffic patterns indicate automated or suspicious activity," such as excessive downloading, YouTube may "require[] completion of a CAPTCHA challenge." *Id.* ¶ 61. Like IP-based blocking, Plaintiffs allege that CAPTCHA challenges are triggered by excessive downloading, specifically by "bot[s]"—and not by an ordinary user watching videos on YouTube. *Id.* And they allege that Meta "circumvented" the technology by downloading in bulk without triggering the CAPTCHA challenge. *Id.* ¶ 63. As with IP blocking, Plaintiffs' allegation that the CAPTCHA penalty was never imposed is incompatible with an allegation that Meta circumvented the unapplied measure. In all events, these speculative CAPTCHA challenges serve as a tool to prevent downloading (i.e., copying) and not to restrict who can view (i.e., access) the work in the first instance.

Proof-of-Origin Tokens: YouTube uses proof-of-origin tokens to "validate [a] request as originating from an authorized YouTube playback environment," i.e., to ensure that a user is merely viewing (i.e., accessing) and not downloading (i.e., copying) content from YouTube. *Id.* ¶ 65. As alleged by Plaintiffs, these tokens do not limit or otherwise affect a user's ability to watch

videos on YouTube. A user does not need to do anything—much less apply any information, process, or treatment—to watch a video on YouTube's platform. *Id.* These tokens are thus not access controls.

On Plaintiffs' own account then, YouTube is the paradigmatic platform where copyrighted works are accessible *without* circumventing access controls. According to Plaintiffs, YouTube's TPMs do not affect the viewing experience on YouTube or otherwise affect a user's ability to "gain access to [a] work." 17 U.S.C. § 1201(a)(3)(B). The TPMs still "allow[] users to 'stream' content—playing it as it is retrieved"—and do not otherwise affect a member of the public's ability to "watch[] and listen[]" to videos on YouTube "for free." FAC ¶¶ 72, 103; *see also id.* ¶ 37 (TPMs permit "view[ing] videos uploaded to YouTube"); *id.* ¶ 46 (TPMs permit "streaming"); *id.* ¶ 71 (similar). Indeed, YouTube's business model depends on such free access. YouTube is a public-facing "video sharing platform." *Id.* ¶ 36. Although YouTube has a paid, premium service, users pay only for a different streaming experience (e.g., advertisement-free service) and the ability to "download" videos onto the YouTube app for "offline streaming." *Id.* ¶ 76. Users do not pay for increased access to the content in the public videos posted by Plaintiffs. *Id.* The whole reason why content creators, like Plaintiffs, upload their works to YouTube is because it allows a broader number of people to view those works. *See supra* at 16. And Plaintiffs' desire for greater access to their videos is reinforced by their asserted injury here: the loss of hypothetical views of their videos from Meta. FAC ¶¶ 144–47.

Instead, as described by Plaintiffs, YouTube's TPMs prohibit only "downloading permanent copies" of YouTube videos. *Id.* ¶ 72; *see also id.* ¶ 38 (TPMs "prohibit[] . . . unauthorized downloading"); *id.* ¶ 46 (TPMs "prevent[] download[ing]"); *id.* ¶¶ 75, 80, 103 (similar). But to "download[]" is a form of "reproduction." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1034 (9th Cir. 2013). And so, a prohibition on downloading protects a copyright holder's exclusive right to reproduction under Section 106—not the right to control access to the work. The legislative history confirms this. Most obviously, the Register of Copyrights used "a technology that blocks users from downloading copies" of a work as the quintessential example of a "measure[] that prevent[s] acts of infringement, rather than access"—

i.e., a copy control. 1997 Hearing at 48. And she stated, unambiguously, that Section 1201 "does not include a prohibition on the act of circumvent[ing]" such a measure that prevents downloading. *Id.* Put simply, a TPM that prohibits downloading is not an access control.

Because YouTube's TPMs "*permit access* to a work but *prevent copying* of th[at] work," they are not access controls. *Corley*, 273 F.3d at 441. Plaintiffs thus cannot state a claim under Section 1201(a)(1). *See Hattler v. Ashton*, No. 16-cv-4099, 2017 WL 11634742, at *5–8 (C.D. Cal. Apr. 20, 2017) (dismissing Section 1201(a)(1) claim for failure to identify access control where plaintiff alleged that defendant had circumvented a TPM that prohibited downloading).

### 2. Plaintiffs' Attempt to Rewrite Section 1201(a)(1) Should Be Rejected

Plaintiffs cannot avoid this straightforward result by rewriting the statute as prohibiting the circumvention of TPMs that control "access to *files* for unauthorized downloading." FAC ¶ 38 (emphasis added). Plaintiffs' core contention appears to be that TPMs that prohibit downloading are access controls because downloading is an act of "unauthorized access" to "the underlying files." *Id.* ¶ 13; *see also id.* ¶ 39 (TPMs "restrict access to Plaintiffs' . . . audiovisual files"); *id.* ¶ 44 (TPMs "protect against file-level access"); *id.* ¶ 55 (rolling cipher "inhibits access to the underlying audiovisual files for the purposes of any downloading, copying or distribution of the audiovisual content"); *id.* ¶ 71 (similar). But that is not what the statute says. Section 1201(a)(1) defines an access control as a TPM that "controls access to *a work*." 17 U.S.C. § 1201(a)(1)(A) (emphasis added); *see also id.* § 1201(a)(3)(B) (to "'effectively control[] access to a work'" is to "require[] the application of information . . . to gain access to *the work*" (emphasis added)). Had Congress intended for Section 1201(a) to protect access to specific files, i.e., "copies of [a] work," FAC ¶ 37, Congress would have said so explicitly.

*First*, controlling access to a "file" is not the same as controlling access to a "work." In copyright law, the term "work" refers to the "original expression . . . entitled to protection." *Sullivan*, 936 F.3d at 567–68; *see also Ets-Hokin*, 225 F.3d at 1079 ("[T]he term 'work' or 'works' is used throughout the Copyright Act to refer to the 'subject matter' that the act is designed to protect: 'original works of authorship.'"). In other words, a "work," in this context, means *the expressive content itself*—i.e., the copyrighted expression embodied in the video files that

YouTube makes available for free public streaming—and not the particular "material object" in which the work is embodied. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 (9th Cir. 2007) ("[a] photographic image is a work," while "[t]he image stored in the computer is the 'copy' of the work for purposes of copyright law"); *London-Sire Recs., Inc. v. Doe 1*, 542 F. Supp. 2d 153, 171 (D. Mass. 2008) (Congress "distinguish[ed] between the abstract, original work on the one hand, which is the source of the copyrights, and its material incarnation on the other"); *Matthew Bender & Co. v. W. Publ'g Co.*, 158 F.3d 693, 702 (2d Cir. 1998) (the Copyright Act establishes a "fundamental distinction" between a work and a copy of that work); *see also* FAC ¶ 149 (conceding that TPMs protect only "digital files embodying copyrighted works"). If the copyrighted *expression* is available without going through or circumventing the TPM, then the TPM does not "control[] access to [the] *work*." 17 U.S.C. § 1201(a)(1)(A) (emphasis added).

Here, Plaintiffs allege, at most, that YouTube has TPMs that present a barrier to parties seeking to "download[]" specific files containing "copies of [Plaintiffs'] work." FAC ¶ 37; *see also id.* ¶ 55 (rolling cipher "controls access to copies of audiovisual content"); *id.* ¶ 103 (YouTube "prohibits, through TPMs, making permanent, unrestricted copies of the content it streams"). And they allege, at most, that Meta circumvented these TPMs by "retriev[ing] permanent copies of content that YouTube makes available only for streaming." *Id.* ¶ 119; *see also id.* ¶ 149. But Plaintiffs never allege that YouTube has TPMs that restrict or otherwise control one's ability to "gain access to the work" in the first place, such as by encrypting the videos so that they cannot be viewed by anyone without the decryption or by using a password that prevents the videos from being viewed absent the password. 17 U.S.C. § 1201(a)(3)(B). Indeed, Plaintiffs acknowledge that the "expression" embodied in those works is readily accessible without circumventing TPMs. *See supra* at 20. As described by Plaintiffs, therefore, YouTube's TPMs are not access controls.

*Second*, Plaintiffs' attempt to equate downloading with access is inconsistent with the structure and purpose of the DMCA. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (noting the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). Plaintiffs allege that TPMs preventing users from copying or downloading content are access

controls, under the theory that a prohibition of copying or downloading restricts the "manner" of access. FAC ¶ 50; *see also id.* ¶ 5 (TPMs "prevent[] access to the works in a form not available to the public"); *id.* ¶¶ 59–60 (short-lived URLs "control[] access by limiting when and from where the file may be requested," i.e., within or "outside ordinary playback"); *id.* ¶ 171 (similar). But Plaintiffs' allegations, taken to their logical conclusion, would mean that all copy controls are also access controls. That is the opposite of what Congress intended.

As explained, Congress carefully distinguished between access and copy controls and created an asymmetrical statutory scheme that treats them differently. *See supra* at 3–8. Section 1201(a) "'protect[s] access to a copyrighted work,'" a right "independent of traditional copyright infringement." *MDY Indus.*, 629 F.3d at 946–47 (citation omitted). Subsection (b) "'protect[s] the traditional copyright rights of the copyright owner'" by "grant[ing] copyright owners a new weapon against copyright infringement." *Id.* (citation omitted). Whereas subsection (a) prohibits circumventing access controls, subsection (b) "d[id] not prohibit circumvention [of copy controls] because such conduct was already outlawed," where appropriate, "as copyright infringement." *Id.* at 945.

As the Ninth Circuit has emphasized, Sections 1201(a) and (b) are thus "not interchangeable." *Id.* at 946 (quoting Senate Rep. at 12). Indeed, "many devices will be subject to challenge only under one of [Sections 1201(a) or (b)]." *Id.* But Plaintiffs' interpretation would collapse this distinction. Take, for instance, a mechanism designed to "prevent[] the copying of an e-book after it has been downloaded to a user's device"—a paradigmatic copy control. USCO 2017 Rep. at 6. Under Plaintiffs' formulation, that mechanism would also be an access control, even though it does not prevent a user from accessing (i.e., reading) the book, because it "restrict[s] users' ability to access" the work by preventing the kind of access that would enable a user to make a copy. FAC ¶ 39. That is not a plausible interpretation of the statute.

*Finally*, if Section 1201(a)(1) creates liability for circumventing a TPM that controls *how* freely accessible works are used or interacted with, as Plaintiffs urge, it would permit an end-run around the requirements and defenses of the Copyright Act. The Copyright Act gives copyright owners several exclusive rights, including the right to reproduction. 17 U.S.C. § 106(1). This

right to reproduction encompasses the right to prevent others from downloading the work. *See Columbia Pictures Indus.*, 710 F.3d at 1034. When this right is infringed, the Copyright Act provides a remedy: "The legal or beneficial owner of an exclusive right under a copyright is entitled, subject to the requirements of section 411, to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). Accordingly, before bringing an infringement claim, such as for unauthorized downloading, a plaintiff must "regist[er] . . . the copyright claim" with the Copyright Office, *see id.* § 411(a), and "deposit as part of his application . . . 'bona fide copies of the original work,'" *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1211 (9th Cir. 1998) (citation omitted). To prevail on the claim, the plaintiff must prove that "(1) he or she owns the copyright in the infringed work, and (2) the defendant copied protected elements of the copyrighted work." *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018). And the plaintiff must defeat any affirmative defenses a defendant raises, including fair use. *See Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021).

To obtain statutory damages for the infringement, the Copyright Act imposes additional requirements. For instance, "[r]egistration prior to infringement or, if the work is published, within three months of publication, is necessary for an owner to obtain statutory damages and attorneys' fees." *Alaska Stock, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 747 F.3d 673, 678 (9th Cir. 2014). Even then, an award of statutory damages is capped at $30,000 per "work," or when a plaintiff has satisfied its burden of proving that "infringement was committed willfully," at $150,000 per "work." 17 U.S.C. § 504(c)(1)–(2).

Section 1201(a) of the DMCA was enacted against this existing backdrop and targeted a specific problem: the circumvention of access controls. For this narrow set of claims, "[a]ny person injured by a violation of section 1201[(a)]" can "bring a civil action . . . for such violation." *Id.* § 1203(a). And it imposes penalties ranging from $200 to $2,500 for each "act of circumvention." *Id.* § 1203(c)(3)(A). Unlike a copyright infringement claim, therefore, a Section 1201(a) claim is not limited to copyright holders and thus does not require registration to initiate a suit or obtain statutory damages. *See, e.g.*, *Echostar Satellite, L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201, 1205 (S.D. Cal. 2008) (collecting cases). And it imposes statutory damages for

"each act of circumvention," rather than for each "work," meaning that damages in a Section 1201(a) case could outstrip statutory damages in an infringement action.

As explained, the legislative history makes clear that Section 1201 was not supposed to replace the Copyright Act as the way to vindicate copyright infringement. *See supra* at 6–8. Indeed, Congress deliberately crafted Section 1201 to not prohibit circumvention of copy controls *because* "such conduct was already outlawed as copyright infringement." *MDY Indus.*, 629 F.3d at 945. And Section 1201 was certainly not enacted to implicitly expand the Copyright Act to prohibit all forms of copying—regardless of whether such copying was fair use—so long as it involved the circumvention of a technological measure. Such a regime would make no sense— and, regardless, Congress explicitly considered and rejected it. Plaintiffs' attempt at an end run around the Copyright Act and its various requirements and limitations should thus be firmly rejected.

## V.    CONCLUSION

For the foregoing reasons, Meta's motion should be granted, and Plaintiffs' FAC should be dismissed. Dismissal should be with prejudice because "[a] party cannot amend pleadings to 'directly contradict an earlier assertion made in the same proceeding.'" *Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (cleaned up). Because Plaintiffs have alleged in three separate complaints against Meta that YouTube's TPMs permit all members of the public to stream, watch, and listen to Plaintiffs' videos on YouTube for free and prohibit only "downloading permanent copies," *see, e.g.*, FAC ¶ 72; Dkt. 1 ¶ 39; Dkt. 1 ¶ 26, *Youngblood*, No. 26-cv-1100 (N.D. Cal. Feb. 4, 2026), any attempt to reverse these core allegations would be impermissible. And any other amendment in the face of those allegations would be futile. *See Airs Aromatics*, 744 F.3d at 600; *see, e.g.*, *Hattler*, 2017 WL 11634742, at *8 (amendment of Section 1201(a) claim would be futile where plaintiff failed to identify access control and "it is uncontested that the Works are accessible to the public on many websites").

Dated:  May 13, 2026

**LATHAM & WATKINS LLP**

By _____ */s/ Joseph R. Wetzel* _____
    Joseph R. Wetzel (SBN 238008)
    *Joe.Wetzel@lw.com*
    Andrew M. Gass (SBN 259694)
    *Andrew.Gass@lw.com*
    Brittany N. Lovejoy (SBN 286813)
    *Britt.Lovejoy@lw.com*
    505 Montgomery Street, Suite 2000
    San Francisco, California 94111-6538
    Telephone: 415.391.0600

    Samir Deger-Sen (*pro hac vice* pending)
    *Samir.Deger-Sen@lw.com*
    1271 Avenue of the Americas
    New York, New York 10020
    Telephone: 212.906.1200

    *Attorneys for Defendant*
    *Meta Platforms, Inc.*