Rom Bar-Nissim (SBN 293356)
Rom@HeahBarNissim.com
HEAH BAR-NISSIM LLP
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: (310) 432-2836

*Attorneys for Plaintiffs and the Proposed Class*
*Additional Counsel on signature page*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., MATT FISHER, GOLFHOLICS, INC., each individually and on behalf of all others similarly situated,<br><br>　　　Plaintiffs,<br><br>vs.<br><br>META PLATFORMS, INC.,<br><br>　　　Defendant. | Case No. 4:25-cv-10931-JST<br><br>Honorable Jon S. Tigar<br><br>**PLAINTIFFS' OPPOSITION TO META'S MOTION TO DISMISS FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(b)(6)**<br><br>Date:　　August 6, 2026<br>Time:　　2:00 PM PT<br>Place:　　Videoconference<br><br>**DEMAND FOR JURY TRIAL**<br><br>Complaint Filed: December 23, 2025 |

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................4

    I.     The Digital Millennium Copyright Act and Section 1201(a). ................................4

    II.    Exemptions to Section 1201(a). .............................................................................5

    III.   YouTube and Access Restrictions. .........................................................................6

    IV.   Meta's Circumvention of YouTube's Access Restrictions. ....................................8

LEGAL STANDARD..............................................................................................................9

ARGUMENT .......................................................................................................................10

    V.    Plaintiffs Have Adequately Alleged Article III Standing .....................................10

    VI.   Plaintiffs Have Statutory Standing Under Section 1203(a) ..................................14

    VII.  Plaintiffs' State a Claim Under DMCA § 1201(a)..................................................17

        A.    The Access-Control Classification Cannot Be Decided on a Motion to Dismiss..................................................................................................17

        B.    Plaintiffs Adequately Allege Access Controls That Meta Circumvented. ...............................................................................................18

        C.    A TPM Can Be Both an "Access" and "Copy" Control. ............................21

        D.    Section 1201(a) Protects Access to Copies of a Work.............................22

        E.    There Is No "End-Run" Around the Copyright Act. ................................23

CONCLUSION.....................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

*Ashcroft v. Iqbal*,
 556 U.S.  (2009) ............................................................................................................... 10, 20

*Cordova v. Huneault*,
 817 F. Supp. 3d 819 (N.D. Cal. 2026) ........................................................... 15, 19, 21

*Davidson v. Kimberly-Clark Corp.*,
 889 F.3d 956 (9th Cir. 2018)................................................................................... 14

*Diamondback Indus., Inc. v. Repeat Precision, LLC*,
 2019 WL 5842756 (N.D. Tex. Nov. 7, 2019) ........................................................... 13

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
 ("VidAngel"), 869 F.3d 848 (9th Cir. 2017)...................................................... passim

*Doe 1 v. GitHub, Inc.*,
 672 F. Supp. 3d 837 (N.D. Cal. 2023) ..................................................................... 14

*Echostar Satellite, L.L.C. v. Viewtech, Inc.*,
 543 F. Supp. 2d 1201 (S.D. Cal. 2008)............................................................... 16, 23

*Edland v. Basin Elec. Power Coop.*,
 2021 WL 3080225 (D.S.D. July 21, 2021) .......................................................... 18, 19

*EVOX Prods., LLC v. Leland Stanford Junior Univ.*,
 2025 WL 4690432 (N.D. Cal. July 23, 2025)............................................................ 11

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
 586 U.S. 296 (2019) ................................................................................................ 13

*Green v. United States Dep't of Just.*,
 111 F.4th 81 (D.C. Cir. 2024) ..................................................................... 1, 4, 5, 6

*Harper & Row Publishers, Inc. v. Nation Enters.*,
 471 U.S. 539 (1985) ................................................................................................ 13

*Hattler v. Ashton*,
 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017) ........................................................ 19

*Hawaii v. Office of Hawaiian Affairs*,
 556 U.S. 163 (2009) ................................................................................................ 15

*Jimenez v. Quarterman*,
 555 U.S. 113 (2009) ................................................................................................ 15

*Justice v. Uncharted Labs, Inc.*,
2026 WL 1430232 (S.D.N.Y. May 21, 2026)........................................................................ 18, 21

*Kadrey v. Meta Platforms, Inc.*,
2025 WL 744032 (N.D. Cal. Mar. 7, 2025).................................................................. 10, 11, 12

*Levitt v. Yelp! Inc.*,
765 F.3d 1123 (9th Cir. 2014).................................................................................................... 9

*Lexmark Intern. Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ................................................................................................................ 15

*London-Sire Recs., Inc. v. Doe 1*,
542 F. Supp. 2d 153 (D. Mass. 2008) ..................................................................................... 23

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008).................................................................................................. 10

*Matthew Bender & Co. v. W. Pub. Co.*,
158 F.3d 693 (2d Cir. 1998)..................................................................................................... 23

*MDY Indus., LLC v. Blizzard Ent., Inc.*,
629 F.3d 928 (9th Cir. 2010).............................................................................................. passim

*Med. Broad. Co. v. Flaiz*,
2003 WL 22838094 (E.D. Pa. Nov. 25, 2003)......................................................................... 13

*N.Y.Times Co. v. Microsoft Corp.*,
777 F. Supp. 3d 283 (S.D.N.Y. 2025)...................................................................................... 11

*Perfect 10, Inc., v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007).................................................................................................. 23

*Post Univ. Inc. v. Learneo, Inc.*,
2025 WL 2702043 (D. Conn. Sept. 23, 2025) .................................................................... 11, 13

*RealNetworks, Inc. v. Streambox, Inc.*,
2000 WL 127311 (W.D. Wash. Jan. 18, 2000)......................................................................... 16

*Recif Res., LLC v. Juniper Cap. Advisors, L.P.*,
2020 WL 5739138 (S.D. Tex. Sept. 24, 2020) ........................................................................ 13

*Shah v. Fandom, Inc.*,
2024 WL 4539577 (N.D. Cal. Oct. 21, 2024)........................................................................ 9, 10

*Silicon Image, Inc. v. Analogix Semiconductor*,
642 F. Supp. 2d 957 (N.D. Cal. 2008) ..................................................................................... 14

iii

*Sony Music Entertainment v. Uncharted Labs, Inc.*,
2026 WL 1019199 (S.D.N.Y. Apr. 15, 2026) ......................................................... 17, 18, 21, 22

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................................................ 10

*The Intercept Media, Inc.v. OpenAI, Inc.*,
767 F. Supp. 3d 18 (S.D.N.Y. 2025) ................................................................................. 11

*Ticketmaster L.L.C. v. Prestige Ent., Inc.*,
306 F. Supp. 3d 1164 (C.D. Cal. 2018) ............................................................................... 9

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ..................................................................................................... 10, 14

*UMG Recordings, v. Kurbanov*,
2021 WL 6492907 (E.D. Va. Dec. 16, 2021) ................................................................... 19

*Universal City Studios, Inc. v. Corley*,
273 F.3d 429 (2d Cir. 2001) ......................................................................................... 21, 23

*Viral DRM LLC v. Seven W. Media, Ltd.*,
768 F. Supp. 3d 1025 (N.D. Cal. 2025) ....................................................................... 16, 23

*Yout, LLC v. RIAA*,
633 F. Supp. 3d 650 (D. Conn. 2022) ....................................................................... 18, 19, 21

**Statutes**

17 U.S.C. § 411(a) ..................................................................................................................... 13

17 U.S.C. § 1201 ................................................................................................................. passim

17 U.S.C. §1201(a) ............................................................................................................. passim

17 U.S.C. §1201(a)(1) ........................................................................................................... 1, 18

17 U.S.C. § 1201(a)(1)(A) .......................................................................................................... 21

17 U.S.C. § 1201(a)(1)(C) ...................................................................................................... 5, 23

17 U.S.C. § 1201(a)(3)(A) ...................................................................................... 5, 18, 19, 20

17 U.S.C. § 1201(a)(3)(B) ........................................................................................ 2, 5, 12, 18

17 U.S.C. § 1201(b) ........................................................................................................ 4, 21, 22

17 U.S.C. § 1201(d) ..................................................................................................................... 5

17 U.S.C. § 1201(e)-(j) ................................................................................................................ 5

iv

17 U.S.C. § 1203 ............................................................................................................. 13

17 U.S.C. § 1203(a) ................................................................................................... 14, 15

**Rules**

Fed. R. Civ. P. 8 ................................................................................................................ 9

Fed. R. Civ. P. 8(a)(2) ....................................................................................................... 9

**Regulations**

37 CFR 201.40(b)(1)(i)–(ii) ............................................................................................. 6

37 C.F.R. § 201.40(b)(1)(ii)(A) ....................................................................................... 6

37 CFR 201.40(b)(3) ........................................................................................................ 6

37 CFR 201.40(b)(4)–(5) ................................................................................................. 6

**Other Authorities**

89 Fed. Reg. 85,437 ......................................................................................................... 5

H.R. Rep. No. 105-551 .................................................................................................. 1, 5

H.R. Rep. No. 105-551(I) ............................................................................................ 4, 22

S. Rep. No. 105-190 .................................................................................................. 1, 4, 6

**INTRODUCTION**

The Digital Millennium Copyright Act prohibits circumventing technological measures that effectively control access to copyrighted works. 17 U.S.C. §1201(a)(1). Congress enacted the DMCA to "create[] the legal platform for launching the global digital online marketplace for copyrighted works" and to ensure that copyright owners received "adequate[] protect[ion]" against unauthorized exploitation. S. Rep. No. 105-190, at 8 (1998); H.R. Rep. No. 105-551 (I), at 9 (1998). Recognizing that "copyright owners [would] hesitate to make their works readily available on the Internet" absent such protection, S. Rep. No. 105-190, at 8, Congress passed Section 1201 to back—"with legal sanctions" —"copyright owners' use of digital walls to protect their copyrighted works from piracy." *Green v. United States Dep't of Just.*, 111 F.4th 81, 89 (D.C. Cir. 2024) (cleaned up).

Because of Section 1201, the "thriving electronic marketplace" that Congress envisioned is now a reality—and YouTube is one of its crowning achievements. YouTube deploys a suite of technological protection measures ("TPMs") that are digital walls designed to prevent anyone from reaching the raw digital files that sit on YouTube's servers and keep certain users, like bots and scrapers, off of the platform altogether. These measures do not merely prevent copying in the colloquial sense; they prevent access to the digital files themselves. Without circumvention, a user cannot obtain, locate, or retrieve the underlying audiovisual file. Meta knows the value of those walls; it has built them around its own platforms and sued scrapers under Section 1201(a) for tearing them down. *See Meta Platforms, Inc. v. Octopus Data, Inc.*, No. 4:22-cv-03921-YGR (N.D. Cal.) ("*Octopus Data*"). What was unlawful circumvention of TPMs when Meta was the victim does not become fair game just because Meta is now the scraper.

Creators, like Plaintiffs, rely on YouTube to publicly perform their works, trusting that YouTube's TPMs will protect their content from unauthorized access and exploitation. They upload their original audiovisual works to YouTube, earn revenue through its ad-supported streaming platform, and rely on YouTube's host of TPMs to ensure that users can view their content without relinquishing control over *how* that content is accessed and used. Meta used automated

1

descrambling tools such as yt-dlp that act as a "bootleg key" and IP-rotation infrastructure to circumvent those protections, millions of times over, and extracted the underlying files so they could be fed into Meta's AI training pipeline. ECF No. 31 (the "FAC") ¶¶ 6-7, 58, 79-135, 145.

Meta advances three arguments in support of its motion to dismiss. *First*, Meta contends that Plaintiffs lack Article III standing to pursue damages because: (1) their alleged economic injuries are implausible and speculative; (2) the injuries alleged require a copyright infringement claim; and (3) Plaintiffs lack standing to bring injunctive relief.

These arguments fail because Plaintiffs allege concrete, property-based injuries that closely resemble traditional harms long recognized in copyright law. Courts addressing DMCA claims in the AI context agree, and have repeatedly held that DMCA-related injuries arising from the unauthorized use of monetizable creative works confer Article III standing. Plaintiffs also have standing to allege injunctive relief claims because Meta continues to retain, deploy, and monetize AI models trained on Plaintiffs' works, creating an ongoing injury.

*Second*, Meta argues that Plaintiffs fall outside Section 1201(a)'s zone of interests. But the plain language of Section 1203(a) authorizes "any person injured" by a violation of Section 1201 to bring a civil action. Plaintiffs fall comfortably within the 1201(a)'s zone of interests because the gravamen of the FAC is the loss of control over *access* to the underlying files—precisely the interest the anticircumvention provision protects. The fact that ordinary users can view Plaintiffs' material on YouTube also does not eliminate their injury or their statutory right to sue. YouTube's TPMs protect *how* Plaintiffs' works are accessed. By circumventing YouTube's TPMs and accessing the audiovisual files in a manner that is outside of the "ordinary course of [YouTube's] operation" (*see* 17 U.S.C. § 1201(a)(3)(B)), Meta violated Plaintiffs' rights under 17 U.S.C. § 1201(a).

*Third*, Meta argues that Plaintiffs fail to state a claim for relief because, according to Meta: TPMs must prevent access rather than merely control it – *i.e.*, "access controls" and "copy controls" are mutually exclusive. According to Meta, Plaintiffs have not adequately alleged the existence of an access control(s) or Meta's circumvention of them. Meta even goes so far as to argue Plaintiffs' reading of the statute threatens fair use.

None of these arguments succeed. Plaintiffs easily state a claim under Section 1201(a) because the FAC plausibly alleges that: (1) YouTube's TPMs are access controls on the underlying audiovisual files; and (2) Meta circumvented those measures to extract permanent copies for AI training. Nothing in the statute, its legislative history or governing case law supports the theory that access controls and copy controls are mutually exclusive. To the contrary, they expressly state the opposite. Further, Plaintiffs more than adequately allege that YouTube's TPMs—rolling cipher, session-bound URLs, IP-based controls, CAPTCHA challenges, and proof-of-origin tokens—function as digital locks that restrict file-level access and automated bulk extraction, as well as Meta's circumvention of those controls. Indeed, numerous claims under Section 1201 have survived motions to dismiss by alleging far less than Plaintiffs have alleged in the FAC.

Meta knows Plaintiffs have alleged a plausible claim because less than three years ago, in this very District, Meta invoked Section 1201(a) to challenge the circumvention of technological measures designed to restrict automated access to freely viewable online content – the same theory asserted here. In *Octopus Data*, Meta sued a data-scraping defendant under Section 1201(a). It alleged access control TPMs identical to those in Plaintiffs' complaint: IP-address blocking, rate and data limits, reCAPTCHA challenges, and machine-learning bot-detection systems. Meta further alleged that these access control TPMs were implemented on its own websites and apps (Facebook and Instagram) to "effectively control access to" its own copyright-protected works. *See* Request for Judicial Notice, Ex. 1 (*Octopus Data* Complaint, ECF No. 35 ¶¶ 28, 71–72). Meta cannot have it both ways and invoke the access control TPMs that Plaintiffs allege when it benefits Meta – yet deride them as too porous to qualify as an access control TPM when Meta circumvents the exact same TPMs.

At this stage, Plaintiffs need only plausibly allege that (1) their works are protected by a "technological measure" that "effectively controls access" to the works, and (2) that Meta circumvented an effective technological measure to access Plaintiffs' works. The FAC, unambiguously and with specificity, alleges that Meta circumvented YouTube's TPMs to gain

3

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

unauthorized access to the files underlying Plaintiffs' works. Plaintiffs have thus stated a plausible claim for relief and the Court should DENY Meta's motion.

**BACKGROUND**

### I.   The Digital Millennium Copyright Act and Section 1201(a).

The DMCA was a response to the Internet's rapid growth. Congress enacted the DMCA to "create[] the legal platform for launching the global digital online marketplace for copyrighted works" and to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of the American creative genius." S. Rep. No. 105-190, at 8; *see also* H.R. Rep. No. 105-551(I), at 9 (the DMCA is "intended to ensure a thriving electronic marketplace for copyrighted works on the Internet"). However, Congress understood that the Internet's vast potential as a distribution channel for creative works could not be realized if rightsholders feared that "massive piracy" would render digital distribution economically unviable. S. Rep. No. 105-190, at 8. Without those assurances, Congress understood, "copyright owners [would] hesitate to make their works readily available on the Internet." *Id.*

As a result, Section 1201 was born. The DMCA "backed with legal sanctions copyright owners' use of digital walls to protect their copyrighted works from piracy." *Green*, 111 F.4th at 89 (cleaned up). Those walls, called technological protection measures ("TPMs"), limit both the use of and access to copyrighted works. *Id.* Section 1201 prohibits (1) circumventing a TPM that "controls access" to a copyrighted work (17 U.S.C. § 1201(a)); and (2) trafficking in a technology designed to circumvent a TPM that "protects a right of a copyright owner" (*id.* § 1201(b)). These provisions are not mutually exclusive—Congress did not pass any language rendering them so, and the Ninth Circuit has explicitly stated that they are not. *Disney Enterprises, Inc. v. VidAngel, Inc.* ("*VidAngel*"), 869 F.3d 848, 864 (9th Cir. 2017) ("[Section 1201] does not provide that a TPM cannot serve as both an access control and a use control[.]").

The conduct at issue in this case falls under Section 1201(a) (the "anticircumvention provision"). To state a claim under Section 1201(a), Plaintiffs need only plead that access to their work is protected by an effective technological measure – which is defined as a measure that

4

"requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(A). Next, Plaintiffs must plead that Meta circumvented the relevant technological measure – which is defined as "descrambl[ing] a scrambled work, ... decrypt[ing] an encrypted work, or otherwise ... avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing] a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(B).

## II. Exemptions to Section 1201(a).

In enacting Section 1201(a), Congress implicitly recognized that the First Amendment does not "guarantee potential fair users unfettered or privileged access to copyrighted works they seek to use in their own expression." *Green*, 111 F.4th at 98. At the same time, Congress understood that Section 1201(a) had the potential to prohibit certain noninfringing fair uses of copyrighted material. H.R. Rep. No. 105-551 (II), at 35–36. For this reason, the anticircumvention provision is subject to specific statutory and regulatory exemptions. *Green*, 111 F.4th at 89–90.

Section 1201 itself provides exemptions, such as an exemption allowing nonprofit libraries to overcome technological controls to gain access to copyrighted works "solely in order to make a good faith determination of whether to acquire a copy of th[e] work" that is not otherwise reasonably available. 17 U.S.C. § 1201(d). Other exemptions in the statute itself include law enforcement and governmental activities, encryption research, security testing, and circumvention for the sole purpose of preventing collection of a user's personally identifying information. *Id.* § 1201(e)-(j).

Congress also created a triennial rulemaking process to accommodate changes in technology. Under Section 1201(a)(1)(C), the Librarian of Congress grants exemptions to those likely to be "adversely affected" by the anticircumvention provision in their ability to make noninfringing uses. *Green*, 111 F.4th at 90. Current exemptions include, among others, excerpts of motion pictures for criticism and comment and for educational purposes, 89 Fed. Reg. 85,437,

5

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

85,439/1 (Oct. 28, 2024) (codified at 37 CFR 201.40(b)(1)(i)–(ii))[1]; preservation of audiovisual works on damaged or deteriorating media by libraries, archives, and museums, *id.* at 85,440/3 (codified at 37 CFR 201.40(b)(3)); and text and data mining of motion pictures and literary works for scholarly research and teaching, *id.* at 85,440/4–5 (codified at 37 CFR 201.40(b)(4)–(5)).

This rulemaking process enables noninfringing fair use while providing "reasonable assurance" to copyright owners that they will be protected against piracy. S. Rep. No. 105-190, at 8; *see also Green*, 111 F.4th at 98. Tellingly, Meta does not identify any statutory or regulatory exemption authorizing mass circumvention of YouTube TPMs for commercial AI training. Instead, Meta effectively asks this Court to create a judicial exemption for industrial-scale AI scraping whenever the targeted works are viewable through an authorized streaming interface. That request is improper and should be rejected.

### III.    YouTube and Access Restrictions.

YouTube, one of the world's largest online streaming platforms, is perhaps the most potent example of how the careful balance struck by Section 1201(a) has helped foster the "thriving electronic marketplace" that Congress intended. Rightsholders can upload a diverse range of content to YouTube for streaming, including short- and long-form films, music videos, movie clips, livestream content, and news. Once uploaded, rightsholders—ranging from major film studios and music labels to independent creators like Plaintiffs—are then able to rely on YouTube's ad-supported streaming service for revenue. FAC ¶¶ 8, 18–19, 21–25, 36–37, 144–45.

Central to YouTube's appeal for rightsholders is the control they retain through the platform's content-sharing process. Rightsholders can upload content for public streaming via YouTube's authorized, ad-supported playback mechanism while simultaneously retaining control over the way their content is accessed and used. *Id.* ¶¶ 37, 40, 69–72. YouTube's playback

[1] This particular exemption, for certain educational uses, involves the circumvention of TPMs controlling access to audiovisual works, including circumstances where educators need to obtain video clips rather than play them directly from YouTube. *See* 37 C.F.R. § 201.40(b)(1)(ii)(A). That exemption makes sense only if circumventing YouTube's TPMs to access and download underlying audiovisual files would otherwise fall within Section 1201(a)'s purview. If YouTube's TPMs were outside Section 1201(a), as Meta suggests, there would be no need for this limited educator exemption.

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

mechanism makes content available for streaming, typically at no cost to the user. *Id.* ¶¶ 37, 46. But while users can *stream* content on YouTube, their ability to access that content is restricted in a number of important ways. For example, YouTube users with a free account are required to view advertisements prior to streaming content, and YouTube's Terms of Service expressly prohibit users from "access[ing], reproduc[ing], download[ing], distribut[ing], transmit[ting], broadcast[ing], display[ing], sell[ing], licens[ing], alter[ing], modify[ing] or otherwise us[ing] any part of the Service or any Content except: (a) as expressly authorized by the Service; or (b) with prior written permission from YouTube and, if applicable, the respective rights holders." *Id.* ¶¶ 74 n.3; 69. YouTube employs a variety of TPMs intended to protect the data files underlying its streaming content. *Id.* ¶¶ 39, 44–49, 55. These TPMs include, but are not limited to, (1) an obfuscated signature system commonly referred to as a "rolling cipher," (2) IP-based blocking and rate limiting that restrict high-volume automated access, (3) short-lived, session-bound streaming URLs, (4) CAPTCHA human-verification challenges triggered by automated activity, and (5) proof-of-origin tokens that verify requests originating from authorized client environments. *Id.* ¶¶ 49, 54-68.

Each of these five TPMs independently functions as a gatekeeping mechanism that must be satisfied before the audiovisual file can be retrieved. TPM (1) (*i.e.*, the rolling cipher) controls access to the underlying media file by withholding a usable file location unless the requesting client transforms an obfuscated signature parameter using proprietary logic embedded in the official YouTube player. Unless a requesting client performs this decryption, the server will not return the audiovisual file. *Id.* ¶¶ 54-56. This ensures that users only access content through YouTube's authorized playback mechanism. *Id.* ¶ 37.

TPM (2) (*i.e.*, IP-based blocking and rate limiting) monitors network behavior and curtails access to YouTube's servers upon detecting excessive or abusive request patterns. Requests from an IP address that exceeds defined thresholds may be throttled, denied, or blocked entirely, cutting off access altogether. *Id.* ¶¶ 57-58.

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

TPM (3) (*i.e.*, session-bound short-lived URLs) restricts access by issuing URLs that are temporary, cryptographically signed, and tied to a particular playback session and client context. Once the authorization window expires or the session ends, the server will refuse to deliver the audiovisual file. *Id.* ¶¶ 59-60. Because these URLs expire automatically, automated systems attempting to gain access to videos outside of ordinary playback are unable to rely on a static link and instead must repeatedly obtain fresh authorization parameters and regenerate valid media URLs. *Id.* ¶ 60.

TPM (4) (*i.e.*, CAPTCHA challenges) conditions continued access on verification that the requester is human rather than an automated system. Until the challenge is successfully completed, the requesting client cannot obtain the data necessary to retrieve the audiovisual file. *Id.* ¶¶ 61-62.

Finally, TPM (5) (*i.e.*, proof-of-origin tokens) requires that requests for video segments include cryptographic tokens demonstrating that the request originates from an authorized client environment and requests lacking valid tokens are denied or degraded. *Id.* ¶¶ 65-68. This prevents unauthorized software from directly requesting audiovisual files unless it possesses credentials proving it is an approved client. *Id.*

### IV.    Meta's Circumvention of YouTube's Access Restrictions.

Meta deliberately circumvented YouTube's TPMs to gain unauthorized access to the underlying data files that are otherwise inaccessible to the public. *Id.* ¶¶ 4–7, 47–53, 80, 119–24. Meta used several tools and methods to do so, such as yt-dlp and IP rotation. *Id.* ¶¶ 6, 62–64, 67, 98, 124–32. Yt-dlp is an open-source tool commonly used for "stream ripping," a process that involves automatically accessing audio and video files directly from a website's servers rather than viewing content through the provider's authorized playback environment. *Id.* ¶¶ 119–20, 124–27. Specifically, yt-dlp automates stream ripping by deciphering YouTube's rolling cipher and extracting the underlying media files directly from YouTube's servers. *Id.* ¶¶ 54-56, 124-27. IP rotation involves the use of virtual machines to intentionally rotate IP addresses to bypass IP blocking and monitoring systems. *Id.* ¶¶ 6, 62-64, 128-32. By employing measures such as these,

Meta circumvented YouTube's TPMs and gained unauthorized access to Plaintiffs' and the putative Class's content. *Id.* ¶¶ 5–7, 51–53, 80, 119–24, 127–32.

The effectiveness of YouTube's IP-based monitoring, rate limiting, and blocking is openly acknowledged within the AI research community. For example, researchers who compiled the "YT-Temporal-180M" and "YT-Temporal-1B" datasets, drawn from approximately six and twenty million YouTube videos to train multimodal AI models, publicly posted on GitHub the bulk-downloading tools they used, including a "download_youtube.py" script built around "YouTube-DL" and its successor "yt-dlp," the same tool Defendant used to access Plaintiffs' and Class Members' audiovisual files. FAC ¶ 98. The accompanying instructions expressly warn that YouTube detects and blocks bulk downloading: "if you don't wait enough between videos, you might get blocked by YouTube." *Id.*

These instructions corroborate Plaintiff's allegations: YouTube monitors the volume and frequency of download requests, refuses those exceeding its thresholds, and blocks offending IP addresses. That measure is effective in the ordinary course of its operation. Even the researchers who assembled the YT-Temporal datasets could not bulk-download YouTube videos without building their tooling around YouTube's blocking. A sophisticated AI developer, such as the Defendant, would be able to deduce that its high-volume activity would be detected and blocked unless it deliberately defeated YouTube's technological guards.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8 requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018) ("[T]here are no heightened pleading requirements for a DMCA circumvention claim …. [Plaintiffs] only need[] to allege facts that, accepted as true, state a claim to relief that is plausible on its face.") (cleaned up). To overcome a motion to dismiss under Rule 12(b)(6), the complaint need only "suggest that the claim has at least a plausible chance of success." *Shah v. Fandom, Inc.*, 2024 WL 4539577, at *2 (N.D. Cal. Oct. 21, 2024) (quoting *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th

Cir. 2014)). "A claim has facial plausibility when [it contains] 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 678 (2009)). When reviewing a motion to dismiss, the Court accepts the facts in the complaint as true and construes the pleadings "in the light most favorable to the nonmoving party." *Id.* (quoting *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008))

## ARGUMENT

### V.    Plaintiffs Have Adequately Alleged Article III Standing

Standing under Article III requires a plaintiff to allege an injury in fact that is fairly traceable to the defendant's challenged conduct and likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury in fact must be concrete and particularized, but concrete injuries include both tangible and intangible harms. *Id.* at 339–40. "Article III standing requires a concrete injury even in the context of a statutory violation." *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). To satisfy Article III's concrete-harm requirement, a plaintiff must allege that the injury bears a "close relationship" to a harm traditionally recognized as actionable in American courts. *Id.* at 424–15.

Here, Meta's Article III standing arguments fail because Plaintiffs' injuries are akin to traditional property-based harms recognized in copyright law. Indeed, Meta's main argument attacks an injury theory Plaintiffs need not rely on at all to establish Article III standing. Plaintiffs' injury is not, as Meta suggests, that Meta failed to sit through ads like an ordinary viewer; it is that Meta allegedly broke through file-level access restrictions to take the works into its own systems for commercial AI training, eliminating Plaintiffs' ability to control, license, or exclude that use.

Courts addressing DMCA claims in the AI context have accordingly repeatedly found Article III standing. In *Kadrey v. Meta Platforms, Inc.*, 2025 WL 744032 (N.D. Cal. Mar. 7, 2025), Meta argued that the plaintiffs' DMCA Section 1202(b) injuries, for interference with copyright-management information, were not sufficiently analogous to traditional copyright harms because the DMCA protects different statutory interests. *Id.* at *1. Judge Chhabria rejected Meta's framing

there (the same argument Meta rehashes here), and found Article III standing because the harm alleged was closely related to harms actionable in copyright. *Id.* ("Article III standing requires that the injury to the plaintiff—not their cause of action or the statute under which it arises—have a close relationship to a traditional harm.").

In *The Intercept Media, Inc. v. OpenAI, Inc.*, the court rejected the argument that a DMCA injury was too abstract under *TransUnion*, explaining that even though "the specific right created by the DMCA may be comparatively new," the injury caused by violation of that right "sounds in the same kind of harm long recognized in copyright suits." 767 F. Supp. 3d 18, 28 (S.D.N.Y. 2025). The court reasoned that copyright has long protected an author's property rights in creative works and that the DMCA "adds another stick to the bundle of property rights already guaranteed to an author in her work under traditional copyright law." *Id.* at 26–28 (explaining harm traditionally actionable in copyright has been "grounded in notions of property rights" since the "Founding Era.")

In *N.Y. Times Co. v. Microsoft Corp.*, the court held that DMCA-based injuries in an AI-training case were concrete because traditional copyright law supplies the necessary historical analogue. 777 F. Supp. 3d 283, 312 (S.D.N.Y. 2025). The court explained that, for both DMCA and traditional copyright claims, the relevant harm involves injury to "an author's property right in his original work of authorship." *Id.* (quoting *The Intercept*, 767 F. Supp. 3d at 23); *see also Post Univ. Inc. v. Learneo, Inc.*, 2025 WL 2702043, at *5 (D. Conn. Sept. 23, 2025) (finding Article III injury where plaintiff presented evidence of monetary harm and injuries analogous to copyright infringement arising from defendant's alleged DMCA violations).

The same result is warranted here. The Complaint alleges that Plaintiffs' videos are economically valuable assets monetized through advertising, sponsorships, and licensing. *See* FAC ¶¶ 18–24. Meta allegedly bypassed technological access controls to obtain and exploited those works for monetary gain without permission or compensation. *Id.* ¶¶ 10, 140–41, 144–50. Through its actions, Meta deprived Plaintiffs of revenue generating opportunities, including the ability to license or otherwise monetize their original works. *See EVOX Prods., LLC v. Leland Stanford*

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

*Junior Univ.*, 2025 WL 4690432, at *3 (N.D. Cal. July 23, 2025) (confirming that monetary harm from uncompensated use of licensable works is sufficient for Article III standing). This is monetary harm, a paradigmatic concrete injury sufficient to confer Article III standing.

Meta's "hypothetical views" argument improperly asks the Court to resolve factual disputes and draw inferences against Plaintiffs at the pleading stage. Meta says it is implausible that, absent circumvention, it would have watched Plaintiffs' videos millions of times through YouTube's authorized player and thereby generated incremental advertising revenue. Mot. at 12. First, Meta's position reinforces the theory that it was not interested in viewing the videos through YouTube's authorized player, *i.e.*, Meta was operating outside of "the ordinary course of [YouTube's TPMs'] operation." *See* 17 U.S.C. § 1201(a)(3)(B). Indeed, Meta confirms that it could not accomplish its AI-training objective through proper access and that it sought and obtained a different form of access than the access Plaintiffs authorized. *See* FAC ¶¶ 4, 37, 41–48. Second, as described above, Plaintiffs' injury is not limited to lost revenue from views, it also includes Plaintiffs being deprived of control over, and compensation for, their revenue-generating works.

Meta's next argument that Plaintiffs' injuries are not compensable through the DMCA because they are copyright injuries, and that Plaintiffs do not claim to be the correct party to assert those rights, is similarly unpersuasive. Mot. at 13.[2] Plaintiffs allege that "[c]ontent creators invest time, skill, and resources into producing their works, and they rely on YouTube's technological protection measures to safeguard their files from unauthorized access." FAC ¶ 13. In addition, "Plaintiffs and Class Members are owners of YouTube channels that uploaded copyrighted audiovisual works that they own and/or license and are publicly performed through the YouTube platform…" *Id.* ¶ 169; *see also id.* at ¶¶ 19, 22, 24 (alleging Plaintiffs derive value from their YouTube hosted videos "via viewership, advertising, sponsorships, licensing, and related monetization.") Therefore, contrary to Meta's assertions, the Complaint contains detailed

---

[2] Meta cites (Mot. at 13) *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928 (9th Cir. 2010), for support, but *MDY Indus.*, did not address standing at all. That case was about the interpretation and construction of the DMCA's subsections and their purpose. As the court stated in *Kadrey*, on the standing inquiry, "[t]he DMCA's purpose … is irrelevant to whether the plaintiffs have suffered a concrete injury." *Kadrey*, 2025 WL 744032, at * 1.

allegations about Plaintiffs' rights to the materials and therefore their ability to pursue damages for how those works are accessed.

To the extent Meta suggests that only the owner of a *registered* copyright can bring a DMCA claim, that argument has been rejected by courts. *See Post Univ. Inc. v. Learneo, Inc.*, 2025 WL 2702043, at *5 (D. Conn. Sept. 23, 2025) ("Limiting actions to *only* the copyright owner finds no footing in the unambiguous text of the DMCA providing that any person injured by a DMCA violation may bright a civil action.") (emphasis in original). Similarly, that lack of formal copyright registration is similarly unpersuasive; *accord Diamondback Indus., Inc. v. Repeat Precision, LLC*, 2019 WL 5842756, at *2 (N.D. Tex. Nov. 7, 2019); *Recif Res., LLC v. Juniper Cap. Advisors, L.P.*, 2020 WL 5739138, at *11 (S.D. Tex. Sept. 24, 2020); *Med. Broad. Co. v. Flaiz*, 2003 WL 22838094, at *3 (E.D. Pa. Nov. 25, 2003).[3]

The argument is also not supported by the Copyright Act itself. The Copyright Act expressly stated that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration" – *i.e.*, claims for copyright infringement under Section 501. 17 U.S.C. § 411(a). No such requirement exists for claims made under 17 U.S.C. § 1201(a). Indeed, the remedies provisions of Copyright Act emphasizes the distinction between: (1) an "infringement" of copyright; and (2) a "violation" of the DMCA. For remedies of a violation of Section 501 (*i.e.*, copyright infringement), the Copyright Act consistently refers to the unlawful conduct as "infringement." *Id.* § 504. In contrast, the Copyright Act describes violations of Sections 1201 and 1202 of the DMCA as a "violation," and does not mention "infringement" at all. 17 U.S.C. § 1203.

Finally, Meta argues that Plaintiffs lack standing to seek injunctive relief because the conduct in the Complaint is in the past tense. Mot. at 14. Not so. Here, Plaintiffs allege that Meta

_____

[3] Meta's musings about whether Plaintiffs could seek alternative redress via copyright infringement claims have no bearing on whether Plaintiffs have adequately alleged standing for their DMCA claims. For example, the holding in *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 586 U.S. 296 (2019) was that a copyright claimant may file a copyright infringement suit only after the Copyright Office has acted on the application and registered the copyright—but the case has nothing to do with the DMCA. Similarly, *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) is a copyright infringement case that was decided before the DMCA was enacted.

used their works to build, train, improve, and commercialize AI models; that Meta's business model includes mass acquisition and ingestion of creators' videos; and that once AI ingests content, creators cannot claw their works back from the model. FAC ¶¶ 12, 15–17, 80–85, 90–102, 140–55. Specifically, the Complaint alleges that: (1) Meta scraped Plaintiffs' and Class Members' videos to "build and train Meta AI Video" (*id.* ¶¶ 1, 7–8); and (2) used Plaintiffs' works to train V-JEPA 2 and Meta AI Video's foundational models (*id.* ¶¶ 18, 21, 23, 26, 28, 30). Importantly, Meta's conduct is ongoing because it continues to benefit from that training and Plaintiffs' works cannot be clawed back from the models which Meta continues to deploy and monetize. *Id.* ¶¶ 12, 15–17, 102, 181–82. Plaintiffs therefore allege ongoing and threatened future harm. *See Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 851–52 (N.D. Cal. 2023) (finding plaintiffs had standing to seek injunctive relief where they plausibly alleged a realistic danger that defendants' AI coding tools would reproduce plaintiffs' licensed code as output without required license text, attribution, or copyright notices). "[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *See TransUnion LLC*, 594 U.S. at 435.

Meta's reference to *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018), actually supports Plaintiffs. The full quote from *Davidson* is: "[p]ast wrongs, though insufficient by themselves to grant standing, are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id*. at 967 (citation omitted). Here, the allegations of Meta's past conduct, coupled with the forward-looking allegations of wrongful retention and use of Plaintiffs' works, are more than sufficient for standing to pursue injunctive relief.[4]

## VI.    Plaintiffs Have Statutory Standing Under Section 1203(a)

17 U.S.C. § 1203(a) is a straight-forward civil remedy provision, which states: "[a]ny person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate

---

[4] Meta's citation to *Silicon Image, Inc. v. Analogix Semiconductor*, 642 F. Supp. 2d 957 (N.D. Cal. 2008) is likewise unavailing. There, the defendant moved for summary judgment on plaintiff's injunctive relief claim and the court rejected the bid to rule out injunctive relief finding "sufficient evidence that injunctive relief might be warranted." The case addressed the merits of injunctive relief, not standing.

United States district court for such violation."[5]  As described above, Plaintiffs adequately alleged violations of Section 1201(a) by Meta's circumvention of the five TPMs that protected their works. *See* §§ III-IV. Likewise, Plaintiffs have Article III standing to bring this action. *See* § V.

Meta attempts to champion an inappropriately narrow interpretation of Section 1203(a). This interpretation is contradicted by the text of the statute, which allows any individual that has been injured by a violation of Section 1201 to bring an action for civil remedies. *See Cordova v. Huneault*, 817 F. Supp. 3d 819, 833 (N.D. Cal. 2026) ("Because [Plaintiff] alleges injury based on defendants' alleged circumvention of technological measures protecting his copyrighted work, he has plausibly alleged statutory standing.")

The doctrine of statutory standing aims to ensure that "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark Intern. Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).  To determine whether a plaintiff comes within a statute's "zone of interest," courts look to whether "[Plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue under [the statute]". *Id.* at 128. "In other words, we ask whether [Plaintiff] has a cause of action under the statute." *Id.*

Citing no direct authority to uphold its narrow view, Meta merely repackages its prior arguments to frame statutory standing as a highly restrictive analysis that somehow prevents Plaintiffs, creators of copyright-protected works, from asserting claims for Meta's "circumvention of copyright protection systems." 17 U.S.C. § 1201. Meta's arguments fail. Plaintiffs assert injuries covered by the DMCA and not just Section 106 (*see* § V); Plaintiffs properly allege violations of 1201(a) by Meta's circumvention of YouTube's TPMs (*see* §§ III-IV, VII); and the fact Plaintiffs make their videos available for viewing on YouTube, but restrict access to the underlying video files, does not defeat a 1201(a) claim.  None of these arguments relate to the zones of interest analysis, which merely confirms that an individual is among those intended to utilize a statutory

[5] "We begin, as always, with the text of the statute." *MDY Indus.*, 629 F.3d at 943 (quoting *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163 (2009)); *see also See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (a court's interpretation of a statute should start with the "plain language of the statute").

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

cause of action. Here, the statute provides that any person injured by a violation of Section 1201 may bring a civil action, and Plaintiffs have amply alleged such injury (*see* § V).

Courts within this Circuit have found that the broad language of the statute enables even non-copyright holders to have statutory standing under the DMCA, as it allows for "any person injured by a violation" to seek redress under the statute. *See Viral DRM LLC v. Seven W. Media, Ltd.*, 768 F. Supp. 3d 1025, 1031-32 (N.D. Cal. 2025) (agreeing that "any person injured by a violation of section 1201 or 1202 may bring an action for such violation, even where that person was not the copyright owner or holder") (quotations omitted) (citing *Echostar Satellite, L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201, 1205 (S.D. Cal. 2008); *RealNetworks, Inc. v. Streambox, Inc.*, 2000 WL 127311, at *6 (W.D. Wash. Jan. 18, 2000)).

Meta's "maximize access" argument conflates two different things that the FAC carefully distinguishes: (1) public viewing through YouTube's authorized service, which Plaintiffs plainly wanted; versus (2) unauthorized file-level retrieval outside that service, which Plaintiffs plainly did not. The FAC alleges that Plaintiffs uploaded their works to YouTube so users could watch them through YouTube's controlled streaming environment*, and* because YouTube "never provides access to the underlying video files," authorizes only access through its own playback systems, and does not authorize automated extraction, direct retrieval, or reconstruction outside that controlled environment. FAC ¶¶ 4, 41–48.

The FAC further alleges that YouTube's Terms of Service reinforces that distinction. It achieves this by authorizing users to view content solely through YouTube's service—while making clear that users receive no right to use the content independent of the service and expressly prohibiting scraping, unauthorized downloading, bulk extraction, and other data-mining of audiovisual content. FAC ¶¶ 69–71, 74. Consequently, Plaintiffs' decision to publish videos on YouTube for broad audience reach does not mean they surrendered the distinct interest protected by § 1201(a): to prevent access to their works outside "the ordinary course of YouTube's operation" by bypassing YouTube's technological gates. *Id.* ¶¶ 47–50, 51–53, 170–177. That is exactly what the FAC alleges Meta did here. *Id.* ¶¶ 80, 82, 103–104, 119–122, 174–179.

This is an important distinction because the Ninth Circuit has held measures controlling the *manner* of access are access controls even where the work may be viewed by different, authorized means. In *VidAngel*, the defendant argued that it did not violate the DMCA because consumers who purchased DVDs and Blu-ray discs could already view the movies through authorized players. *VidAngel*, 869 F.3d at 863–65. The Ninth Circuit held that TPMs still controlled access because only authorized players had the keys needed to access the works in the protected format. *Id*. at 864– 65. The court held that VidAngel's use of software to decrypt the TPMs and obtain a digital copy of the movie was "exactly like 'breaking into a locked room in order to obtain a copy of a [movie].'" *Id*. at 865. The same principle applies here. YouTube permits authorized streaming, just as the DVD owners in *VidAngel* could watch the movies. But YouTube's TPMs still control access to the underlying audiovisual files because they prevent the type of access Meta is alleged to have accomplished here.

## VII.    Plaintiffs State a Claim Under DMCA § 1201(a)

### A.  *The Access-Control Classification Cannot Be Decided on a Motion to Dismiss.*

Meta asks the Court to hold, at the pleading stage, that the five TPMs described in the FAC are categorically "copy controls," which Meta insists are distinct from "access controls" covered by § 1201(a). Mot. at 16-21. Meta's argument is premature. Whether the alleged TPMs function as access controls, copy controls, or both depends on the operation of YouTube's technical measures and cannot be resolved against Plaintiffs on a motion to dismiss.

Two courts recently agreed and declined to dismiss materially identical allegations. In *Sony Music Entertainment v. Uncharted Labs, Inc.*, 2026 WL 1019199, at *3 (S.D.N.Y. Apr. 15, 2026), an artificial-intelligence developer that stream-ripped YouTube videos argued that YouTube's rolling cipher was a copy control and that the plaintiffs had not pleaded circumvention of an access control. The court denied dismissal, holding that the complaint "plausibly alleges that YouTube employs technological measures that regulate access to its content and that Defendant circumvented them under the pleading standard set by Rule 8(a)." *Id.* Further, the Court held it "cannot resolve the statutory question at this stage" because the pleadings did not "establish how those measures

function sufficiently to determine their legal classification." *Id.* "Whether YouTube's measures ultimately constitute access controls within the meaning of § 1201 requires a greater factual record than the pleadings contain." *Id.*[6] The court reached the same result on the same theory in *Justice v. Uncharted Labs, Inc.*, 2026 WL 1430232, at *2 (S.D.N.Y. May 21, 2026).

**B.  *Plaintiffs Adequately Allege Access Controls That Meta Circumvented.***

To the extent the Court decides to engage with the (false) distinctions offered by Meta at the pleading stage, the FAC diligently identifies five separate TPMs at issue, explains how they are "access controls," and alleges how Meta circumvented them. FAC ¶¶ 49, 54–68.[7]

Section 1201(a) prohibits circumventing a technological measure that "effectively ***controls*** access to a work protected under this title." 17 U.S.C. § 1201(a)(1) (emphasis added). A technological measure effectively controls access when, "in the ordinary course of its operation," it requires "the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id*. § 1201(a)(3)(B). Circumvention includes "descrambl[ing] a scrambled work," "decrypt[ing] an encrypted work," or otherwise "avoid[ing], bypass[ing], remov[ing], deactivat[ing], or impair[ing] a technological measure, without the authority of the copyright owner." *Id*. § 1201(a)(3)(A).

The phrase "controls access" is markedly different than Meta's preferred phrase: "prevents access." *See Yout, LLC v. RIAA*, 633 F. Supp. 3d 650, 664 (D. Conn. 2022) *appeal pending*, No. 22-2760 (2d Cir.) ("[T]he plain meaning of a measure that 'controls access' to a protected work appears to be broader than a measure that 'prevents' access to a copyrighted work."). That YouTube permits users to stream videos for free and that the works may be viewed by the public *see e.g.*, FAC ¶ 37, does not establish that access is unfettered and uncontrolled. The statute does not require

[6] The motion rejected in *Sony*, which addressed the same YouTube TPMs, was litigated by the same Latham & Watkins attorneys who sign Meta's motion here.

[7] To be clear, Plaintiffs do not need to identify which particular measure Meta circumvented or detail the mechanics of circumvention to state a plausible claim. *See Edland v. Basin Elec. Power Coop.*, 2021 WL 3080225, at *6 (D.S.D. July 21, 2021) (holding that plaintiff need not identify the specific TPM that was circumvented as that would require specificity beyond what is needed at the motion to dismiss stage). However, Plaintiffs do so here, in great detail, as laid out below.

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

absolute exclusion from every possible encounter with the work. *See MDY Indus.*, 629 F.3d at 954 n.17 (the statute "does not require that an access control measure be strong or circumvention-proof"; it requires only that the measure provide "some degree of control over access to a copyrighted work."). Courts addressing virtually identical TPM allegations have rejected the argument that they cannot qualify as access controls merely because videos are viewable by the public. *See Yout*, 633 F. Supp. 3d at 664–72; *Edland v. Basin Elec. Power Coop.*, 2021 WL 3080225, at *6 (D.S.D. July 21, 2021). *See Cordova*, 817 F. Supp. 3d at 832–35 (where a valid access control is alleged to have been circumvented then "whether the videos may be viewed by the public is immaterial.")[8]

Plaintiffs sufficiently detail these access controls in the complaint. *See supra*. Background §III. Plaintiffs allege that the rolling cipher acts as a "digital lock" that withholds a usable file URL absent proprietary decryption. FAC ¶¶ 54–56. That the lock can be defeated does not disqualify it, because the measure "provide[s] some degree of control over access." *MDY*, 629 F.3d at 954. Moreover, Courts have found this specific TPM to be an access control. *See Cordova*, 817 F. Supp. 3d at 832–35 (finding YouTube's rolling cipher an access control); *Yout*, 633 F.Supp.3d at 665, 670; *UMG Recordings, v. Kurbanov*, 2021 WL 6492907, *4 (E.D. Va. Dec. 16, 2021). The session-bound URLs expire and then cause the server to "refuse to deliver the audiovisual file," which Meta defeated by "programmatically renewing expired credentials." FAC ¶¶ 59–60. The proof-of-origin tokens are a classic authentication measure conditioning delivery on credentials generated only within an authorized session. *Id*. ¶¶ 65–68.

On IP rotation tools, Meta argues that Plaintiffs' allegations show that Meta used this measure to *avoid* triggering IP block and CAPTCHA evidencing (in Meta's view) that those measures were "never imposed" and so were not ever "circumvented." Mot. at 18-19. A burglar who slips past the alarm has still circumvented it; § 1201(a)(3)(A) reaches avoiding and bypassing

---

[8] Meta cites (Mot. at 21) a single contrary authority, *Hattler v. Ashton*, 2017 WL 11634742 (C.D. Cal. Apr. 20, 2017), but that case pre-dates key contrary Ninth Circuit authority. *Hattler* dismissed a 1201(a) claim on the premise that the measure permitted access but restricted copying, the very reading the Ninth Circuit in *VidAngel* rejected. *See VidAngel*, 869 F.3d at 864–65.

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

a measure, not only defeating one after full engagement. Circumvention expressly includes to "avoid, bypass, remove, deactivate, or impair" a measure, 17 U.S.C. § 1201(a)(3)(A), and an access control may both "block initial access" and "revoke access" after a secondary check. *See MDY*, 629 F.3d at 944. Plaintiffs allege Meta defeated the IP blocking and CAPTCHA TPMs by "substituting a new IP address before the block can be enforced." FAC ¶¶ 57, 62–63. Moreover, Plaintiffs allege that Meta's "[l]arge-scale scraping operations" would "necessarily generate request patterns that trigger CAPTCHA challenges," and that Meta circumvented these challenges by using "rotating IP addresses." *Id.* ¶¶ 61-63. Given this, the Court may reasonably infer that Meta circumvented YouTube's CAPTCHA challenges to gain unauthorized access to Plaintiffs' works. That is precisely the kind of reasonable inference the Court must draw in Plaintiffs' favor at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In sum, Plaintiffs allege that the TPMs at issue prevented unauthorized users, bots, and scrapers from reaching and extracting the underlying audiovisual files hosted on YouTube's servers. *See* FAC ¶¶ 7, 47, 53-68, 128-29, 173, 178. Plaintiffs allege that YouTube's TPMs prohibit file-level retrieval, restrict access to content outside the playback environment, and prevent automated bulk extraction. *See id.* ¶¶ 46, 55, 59–65, 70, 72, 103, 119, 124, 149. Meta is alleged to have used tools and methods to circumvent these technical restrictions and obtain access to the works in a form not available to ordinary users. *Id.* ¶¶ 5–7, 51–53, 62–68, 80, 121–32, 134–39.

Meta's reliance (Mot. at 17) on YouTube's Terms of Service for the proposition that Plaintiffs granted users a license to access their work is also not persuasive. First, YouTube's Terms of Service independently confirm that Meta's alleged conduct here is unauthorized: they prohibit scraping, unauthorized downloading, bulk extraction, and data mining of audiovisual content, and YouTube's CEO has publicly stated that downloading video bits for AI training violates YouTube's Terms. FAC ¶¶ 69, 73–74. Second, even if Plaintiffs authorized users to access their material, this does not equate to authorization to *circumvent* the measures controlling access, as § 1201(a)(3)(A) "exempts from circumvention liability only those whom a copyright owner authorizes to circumvent an access control measure, not those whom a copyright owner authorizes to access the

work." *VidAngel*, 869 F.3d at 865 (quoting *MDY Indus., LLC v. Blizzard Ent., Inc.,* 629 F.3d 928 n.16 (9th Cir. 2010), *as amended on denial of reh'g* (Feb. 17, 2011), *opinion amended and superseded on denial of reh'g,*, 2011 WL 538748 (9th Cir. Feb. 17, 2011)).

Further, even if the Court were swayed by Meta's criticisms of *Yout*—that the parties there did not fully develop the access-control/copy-control distinction—the most recent and most factually analogous post-*Yout* decisions have still refused to dismiss materially similar § 1201(a) claims. *Compare Yout*, 633 F.Supp.3d at 662–72 *with Sony Music Ent.*, 2026 WL 1019199, at *3 (denying dismissal because the complaint plausibly alleged that YouTube employs technological measures that regulate access to its content and that defendant circumvented them, and holding that whether those measures ultimately qualify as access controls requires a fuller factual record); *Justice*, 2026 WL 1430232, at *3 (following *Sony* and again denying dismissal of a YouTube/stream-ripping § 1201 claim); *Cordova*, 817 F.Supp.3d at 832–35 (holding that the plaintiff plausibly alleged statutory standing, effective technological measures controlling access, and circumvention of those measures). In other words, even after *Yout* and even with the access/copy distinction squarely in view, courts confronting YouTube-based anti-circumvention claims have declined to foreclose them at the pleading stage.

### C. *A TPM Can Be Both an "Access" and "Copy" Control.*

Meta's argument that a TPM is *either* an access control under § 1201(a) *or* a copy control under § 1201(b) has been squarely rejected as a false dichotomy. "[T]he statute does not provide that a TPM cannot serve as both an access control and a use control," and a defendant "could … violate both § 1201(a)(1)(A) … and § 106." *VidAngel*, 869 F.3d at 865. Nothing conditions § 1201(a) on the circumventor's purpose or post-circumvention conduct; the DMCA "targets the circumvention of digital walls … but does not concern itself with the use of those materials after circumvention has occurred," and reaches piracy "before the work was even copied." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443, 435 (2d Cir. 2001).

Meta's reliance on *MDY*'s statement that §§ 1201(a) and (b) are "not interchangeable" is misplaced. (Mot. at 23.)[9] That language describes the two statutory provisions and "classes of devices," but articulates no bar on one measure satisfying both. 629 F.3d at 945–46. Indeed, the *MDY* court acknowledged the possibility of a measure serving as both stating: "if a copyright owner puts in place an effective measure that both (1) controls access and (2) protects against copyright infringement, a defendant who traffics in a device that circumvents that measure could be liable under both § 1201(a) and (b)." *MDY*, 629 F.3d at 946. The *Sony* court agreed and applied that principle to YouTube's TPMs, accepting as plausible that a measure "can qualify as both an access control and a copy control." 2026 WL 1019199, at *3. Meta's e-book hypothetical (Mot. at 23) proves the distinction. There Meta is hypothesizing about a measure that blocks copying *after* authorized access has been obtained, which is a post-access copy control. YouTube's TPMs are different: they allegedly control whether a user can reach the underlying audiovisual files in the first place. FAC ¶ 48.

**D.  *Section 1201(a) Protects Access to Copies of a Work.***

Meta's fallback, that "access to a work" means access only to disembodied expression, not to any file embodying it, finds support in neither the text of the statute nor its legislative history.

The House Report explains that § 1201(a) "applies when a person has not obtained authorized access to *a copy or a phonorecord* of a work." H.R. Rep. No. 105-551(I). The *VidAngel* case likewise described circumventing disc encryption as "the electronic equivalent of breaking into a locked room in order to obtain a copy," even though the films were viewable on licensed players, treating access to the copy as tantamount to access to the work. 869 F.3d at 865.

Meta's reading would prove too much: if a "work" meant only expression perceivable through some authorized channel, virtually no internet access control would qualify, because most

[9] This is not the only example of Meta overreading *MDY*. Meta also cites *MDY* for the proposition that Congress enacted the DMCA, in part, to encourage creators to make their works available in digital formats that allow consumers to "borrow" them for a limited time or limited number of uses. Mot. at 3. To be clear, Meta is not alleged to have "borrowed" anything, Meta bypassed YouTube's TPMs to download *permanent* copies of the underlying audiovisual files to be retained in perpetuity and used for AI training. FAC ¶¶ 72, 98, 108, 111, 144–47.

content can be streamed, previewed, or sampled somewhere. Further, the work/copy cases Meta marshals are not Section 1201(a) cases. *See* Mot. at 22 (citing *Matthew Bender & Co. v. W. Pub. Co.*, 158 F.3d 693, 702 (2d Cir. 1998); *London-Sire Recs., Inc. v. Doe 1*, 542 F. Supp. 2d 153, 170 (D. Mass. 2008); *Perfect 10*, *Inc., v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007)). The FAC alleges Meta "accessed and obtained the audiovisual works themselves not merely 'files' distinct from those works." FAC ¶ 51.

### E.   *DMCA Claims Are Not an "End-Run" Around the Copyright Act.*

Meta warns that sustaining Plaintiffs' claim would evade the Copyright Act's registration, proof, fair-use, and damages requirements. This argument reveals Meta's fundamental misunderstanding of § 1201(a), which Congress created as a right "independent of traditional copyright infringement," with its own elements and remedies. *MDY*, 629 F.3d at 945–46.

A § 1201(a) claim therefore requires no copyright registration, because it does not vindicate the § 106 rights to which § 411(a) attaches, and the FAC pleads exactly that. FAC ¶ 13; *see Viral DRM*, 768 F.Supp.3d at 1031-32; *Echostar*, 543 F.Supp.2d at 1205. Meta's point that per-act statutory damages may exceed an infringement award goes to the scope of relief, not the sufficiency of the claim, and cannot be a basis for dismissal under Rule 12(b)(6).

Nor do Plaintiffs' claims threaten fair use. Even assuming Meta could assert fair use as a defense to a separate (not asserted) copyright infringement claim, fair use does not give Meta a license to circumvent access controls. In other words, a person might have a fair-use defense to copyright infringement and still violate Section 1201(a) by breaking through access controls to obtain the work. *See Corley*, 273 F.3d at 459 ("Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original.") Additionally, as explained above (*see supra*. § II), there already exists a "fail-safe" in the statute via the triennial exemption process, 17 U.S.C. § 1201(a)(1)(C). A party who believes the right is too broad must pursue that channel, not ask the Court to rewrite the statute.

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

# CONCLUSION

For the foregoing reasons, the Court should deny Meta's motion to dismiss. If it concludes that Plaintiffs' claims are insufficiently pleaded, Plaintiffs request leave to amend.

Dated: June 12, 2026

Respectfully submitted,

*/s/ Rom Bar-Nissim*
Rom Bar-Nissim (SBN 293356)
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel: (310) 432-2836
Rom@HeahBarNissim.com

Jarrett Lee Ellzey*
Tom Kherkher**
Leigh S. Montgomery*
**ELLZEY KHERKHER SANFORD**
**MONTGOMERY LLP**
4200 Montrose Street, Suite 200
Houston, TX 77006
Tel: 713-244-6363
JEllzey@EKSM.com
TKherkher@EKSM.com
LMontgomery@EKSM.com

William J. Edelman (SBN 285177)
**MILBERG, PLLC**
280 South Bevely Drive, Penthouse
Beverly Hills, CA 90212
Tel: (771) 474-1121
wedelman@milberg.com

Michael A. Acciavatti*
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: (212) 594-5300
macciavatti@milberg.com

*Attorneys for Plaintiffs and the Proposed Class*
* *pro hac vice* forthcoming
** admitted *pro hac vice*

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST

## CERTIFICATE OF SERVICE

I hereby certify this 12th day of June, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification to the attorneys of record, and is available for viewing and downloading.

*/s/ Rom Bar-Nissim*

Plaintiffs' Opposition to Meta's Motion to Dismiss First Amended Complaint
Case No.: 4:25-cv-10931-JST